[L.A. No. 28179.   In Bank.   Aug. 27, 1965.]

CITY OF LOS ANGELES, Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and ART FRAIDE, Respondents.

Roger Arnebergh, City Attorney, Bourke Jones and Edwin F. Shinn, Assistant City Attorneys, and J. David Hanson, Deputy City Attorney, for Petitioner.

Everett A. Corten, Edward A. Sarkisian, Levy, DeRoy, Geffner, Koszdin & Glow, Abe F. Levy and Henry P. Nelson for Respondents.

TOBRINER, J.—In this case, which is one of many arising from a dispute between the City of Los Angeles and its policemen and firemen who suffered work-incurred disability, we must decide whether the city may properly take a complete credit against its workmen's compensation liability to these employees on the ground that it paid disability pensions from the City of Los Angeles Fire and Police Pension Fund (hereinafter called "disability pensions"). The fund, however, consists of deductions or contributions from the employees' salaries as well as the city's tax allocations to it. For the reasons we set forth below, we have concluded that the city is entitled to no more than a partial credit against its workmen's compensation liability commensurate with the proportion of its tax payments to the fund.

Labor Code section 3751 provides that, "No employer shall exact or receive from any employee any contribution, or make or take any deduction from the earnings of any employee, either directly or indirectly, to cover the whole or any part of the cost of compensation under this division. . . ." If, by means of paying disability pensions, which are financed in part by employee contributions or deductions, the city may reduce or discharge workmen's compensation liability, which must be met solely with tax dollars, the city has violated section 3751. We have concluded that, under the present pension system, to permit total reduction or discharge of workmen's compensation liability would be to sanction a violation of Labor Code section 3751.

In February 1947 Fraide, while on duty as a Los Angeles city policeman, sustained a gunshot wound which damaged his spinal cord and resulted in permanent disability. The city paid him his full salary for the year following the accident. Since February 1948 the city has paid Fraide a disability pension from the City of Los Angeles Fire and Police Pension Fund. In February 1963 Fraide filed an application with the Industrial Accident Commission for benefits under the workmen's compensation law. The commission granted the benefits, refusing to allow the city any credit against the workmen's compensation for the disability pension paid.[1]

[1]The city does not contend that the statute of limitations bars Fraide's claim. Apparently Fraide filed his application for benefits less than a

The commission granted a petition for reconsideration but affirmed its previous determination. The city unsuccessfully petitioned the District Court of Appeal for a writ of review and thereafter petitioned this court to review the Industrial Accident Commission's order. The commission joined in requesting this court to adjudicate the issue.

Article XVII of the City of Los Angeles Charter establishes a system of pensions for city firemen and policemen. Charter section 186 creates a "fund," "to be known as the fire and police pension fund." The fund is administered by the Board of Pension Commissioners. (Charter, § 180.) Section 186½ provides that each member of the fire and police departments "shall contribute to said fire and police pension fund" an amount equal to 6 per cent of the amount of his salary. With several minor exceptions, taxes provide the remaining source of money for the fund. (Charter, § 186.)[2]

"Service," "disability" and "widow" pensions constitute the major obligations met by the fund. (Charter, §§ 181, 182, 183.) Section 182½ of the charter provides that if an employee receives a compensation award, then any disability pension payment shall "be construed to be and shall be payments of such compensation."[3]

The city contends that the provisions of section 182½ entitle it to a total credit against its workmen's compensation liability for the disability pension paid. The same contention engaged the attention of this court in *Healy* v. *Industrial Acc. Com.* (1953) 41 Cal.2d 118 [258 P.2d 1]. In that case the commission had granted the city a credit for the dis-

---

year after the city furnished him medical and hospital treatment. Thus the statute of limitations would not bar his claim. (Lab. Code, § 5405, subd. (c).)

[2]Interest and earnings from investments, donations, fines and proceeds from the sale of unclaimed property also provide monies for the fund.

In 1959 the city amended the charter to place the fund on a "reserve basis." Charter sections 186.1 and 186.2 were added in that year to provide the mechanics for determining the amount of tax to be levied under the new accounting system.

[3]Section 182½ proceeds to provide that, "any payments made under the provisions of this article shall be first applied to payment of such compensation or award and any balance of such payments made pursuant to the provisions of this article shall be deemed to be pension payments; and it is hereby provided that the pension provided for in this article for such member . . . shall be reduced in amount to the difference between the amount of pension provided for in this article, and the total amount of such compensation or award granted and paid under such general law until the total amount awarded under such general law shall have been fully paid."

ability pensions paid. When Healy argued that Labor Code section 3751 prohibited the commission from granting the credit, the commission rejected the argument upon the ground that charter section 182½ controlled and precluded the application of the code section. We disagreed with the commission's assumption. We held that, "If . . . there is any conflict between charter provisions and the compensation sections of the Labor Code, the latter must prevail." We therefore held that, "the validity of the credit given the city depends upon whether Healy contributed to the pension for which the credit was allowed and whether as a result of the credit he was required, directly or indirectly, to pay part of the cost of his compensation in violation of section 3751." (P. 122.)

We did not, however, reverse the commission's order but rather remanded the case to the commission. We observed, "The city claims that Healy did not in fact contribute to the pension fund and that, in any event, the pension he received was actually paid solely out of tax money. The record, however, does not disclose the practice followed by the city in operating the pension system, and factual questions may be involved with respect to the making and allocation of employees' contributions and the manner in which the pension fund was administered. In the absence of evidence and findings on these matters, we should not attempt to pass upon the city's claim that Healy did not contribute to the pension which he received."[4] (*Id.* at p. 122.)

On remand the commission granted a credit to the city, finding that, "The entire amount of the disability pension . . . is paid from money appropriated for this purpose by the city and no part is paid from the amount which has heretofore been deducted from the applicant's salary. This deduction . . . constitutes a fund for the payment of service retirement pensions of members of the fire and police departments."

Subsequently, in *City of Los Angeles* v. *Industrial Acc. Com.* (*Morse*) (1963) 28 Cal. Comp. Cases 42, the commission reversed the position it had taken in *Healy*. Panel Two of the commission, in its opinion and order after reconsideration stated: "The compelling fact is that the payroll con-

---

[4]Contrary to the city's contention we find no plausible support in *Healy* for the proposition that, to bring section 3751 into operation, the employee must have a "financial investment or proprietary interest" in the pension. Nor does section 3751 permit such artificial construction.

tributions became part of an amalgam out of which all the pensions were paid. The moneys were co-mingled and there was no earmarking and no segregation.'' The District Court of Appeal denied the city's petition for a writ of review. We denied a petition for hearing.

In the instant case the commission, following its ruling in *Morse*, denied the city any credit. Upon judicial review we must determine whether the commission's factual determinations are supported by substantial evidence and whether the commission correctly disposed of any legal issues. (Lab. Code, § 5952.)

Our inquiry first focuses on the question: Did the city ''exact or receive from [Fraide] . . . any contribution, or make or take any deduction from [his] earnings, either directly or indirectly . . .''? Since we have concluded that we must answer that question in the affirmative we face a second question: If the city is permitted to take a credit, would any of the deduction from earnings be used by the city to ''cover the whole or any part of the cost of [workmen's] compensation''?

A. *The city took a deduction from Fraide's earnings.*

We cannot accept the city's rather metaphysical contention that it took no ''deduction'' from Fraide's earnings, but that ''only 94% of the amount initially shown [as salary] constitutes his earnings or income'' and that the 6 per cent deduction merely represents a transfer of funds from the city treasury's general fund to the pension fund.

The Los Angeles City Charter, section 186½, states that ''Each member of the Fire and Police Department included within the pension provisions of this article *shall contribute* to said fire and police pension fund in the manner as hereinafter in this section provided.'' The section proceeds to provide that the administrative head of each department shall ''cause to be shown on each and every payroll of said department *a deduction of six per cent (6%) of the amount of salary,* as shown on each such payroll, of each such member. . . .'' Further, each member ''shall be deemed to consent and agree to each *deduction.* . . .'' Finally, charter section 186 also provides that one source of money for the pension fund consists of ''*deductions* from the salaries of the members of the Fire and Police Departments. . . .'' (Italics added.)

The city unsucessfully attempts to sustain its position by

reliance upon the tax treatment of the deduction and previous appellate court rulings.

We find no merit in the city's first contention that its treatment of the 6 per cent deduction under the tax law demonstrates that it took no deduction from Fraide's earnings. The parties' stipulation that the "6% amount" is not "gross income" of the employee within the tax laws does not ipso facto compel the conclusion that the "6% amount" is not a "deduction" from earnings within the broad language of Labor Code section 3751. The reason for noninclusion in "gross income," as evidenced in a letter from the Commissioner of Internal Revenue to the department of pensions, does not support the city's position. In that letter the commissioner ruled: "In view of the fact that participation in the System is compulsory and that there is no provision for the refund of the *amounts withheld from the salaries* of the policemen and firemen in the event they leave the service voluntarily or involuntarily prior to the date upon which they become eligible for retirement, it is the view of this office that *amounts withheld from the salaries of such members should not be included in their gross income for Federal Income Tax purposes.*" (Italics added.) Such reasoning may support noninclusion in "gross income" but certainly does not show that the city did not take any deductions from the employees' salaries.

The city secondly relies upon certain decisions dealing with pension funds but these cases do not apply to the instant issue. Thus the city cites *Benson* v. *City of Los Angeles* (1963) 60 Cal.2d 355 [33 Cal.Rptr. 257, 384 P.2d 649], a case in which we declared the rights arising from a widow's pension. Benson, a fireman employed by the city from 1916 to 1940, died in 1960. He married his first wife, Teresa, in 1920, and after he retired divorced her; he married Olive in 1953 and resided with her until his death in 1960. Both Teresa and Olive claimed the widow's pension. We held that, under the contract of employment, Olive should prevail. The city argues that the result of that case "further substantiates that the '6% amount' cannot be deemed earnings of the employee within the meaning of Labor Code section 3751." This conclusion rests on the city's assumption that *Benson* means that, "the community makes no investment whatsoever in the pension system. And if the community makes no investment then the employee does not."

We were careful, however, to state in *Benson*: "This is not

to say that upon a division of the community estate [Teresa] . . . could not have participated therein. Undoubtedly she had an interest which she could have asserted in the payments to August during his lifetime, had she sought to do so. But after August's death the only right remaining was to enforce the city's covenant to make payments to the 'widow.' '' (P. 360.)

The city also relies on *Pennie* v. *Reis* (1889) 132 U.S. 464 [10 S.Ct. 149, 33 L.Ed. 426], *Eaton* v. *City of Los Angeles* (1962) 201 Cal.App.2d 326, 331-332 [20 Cal.Rptr. 456], and *Nicols* v. *Police Pension Fund Comrs.* (1905) 1 Cal.App. 494 [82 P. 557], to support its argument that the "6% amount" constitutes merely a transfer of retained funds from the city treasury to the pension fund. Although these cases characterized an amount of money deducted from the employee's pay check as "money of the state retained in its possession . . . " rather than "contribution" to the pension fund by the employee,[5] they do not reach the present issue. In none of them did the court apply the broad language of Labor Code section 3751 which prohibits the city from exacting or receiving "any contribution, *or make or take any deduction from the earnings of any employee, either directly or indirectly* [to cover the cost of workmen's compensation] . . . ." (Italics added.)[6] Furthermore, neither *Pennie* nor *Nicols* involved the construction of the Los Angeles City Charter. In *Eaton,* which did deal with the Los Angeles charter, the court merely referred to *Pennie* and *Nicols* and their reasoning. It did not reexplore the problem anew.

In summary, to permit the city to characterize the 6 per cent deduction as a mere interdepartmental transfer of funds would be to nullify the salutary purpose of Labor Code section 3751. The very language of that section refutes the city's position. Not only is an employer prohibited from exacting or receiving a "contribution" from an employee, but he may not, "make or take a deduction from the earnings of any employee." The statute forbids either undertaking "directly or indirectly." When we juxtapose the charter

---

[5]In *Pennie* the court stated that "no money was contributed by the police officer out of his salary." (*Pennie* v. *Reis, supra,* 132 U.S. at p. 470.)

[6]In *Pennie* the court was concerned with whether the employee had a vested property right to the pension money so that a change in the pension would deprive him of property without due process of law. In *Eaton* and *Nicols* the courts held that the pension did not constitute an express trust for purposes of avoiding the statute of limitations.

provisions, which repeatedly speak in terms of "deduction," with section 3751, which expressly prohibits a deduction, the artificiality of the city's contentions becomes all too clear.[7]

B. *The city fails to show that, in taking the credit against workmen's compensation liability, it will not use deductions from earnings to "cover the whole or any part of the cost of [workmen's] compensation"; the city is, however, entitled to a partial credit.*

■ The city allocates employee deductions to the pension fund. (Charter, § 186½.) Additionally, it allocates tax monies to the very same fund. (Charter, §§ 186, 186.2.) No charter section provides for earmarking or segregating these two kinds of contributions. Although the city contends that in paying disability pensions from this fund it does not use a single dollar that comes from deductions from employees' salaries, the city fails to show that as a matter of practice or as an accounting procedure it did not use employee contributions. Indeed the Industrial Accident Commission found that the city so utilized the deductions.

The city nevertheless contends that it is entitled to a complete credit against all of its workmen's compensation liability, and, to support this position, offers a series of theoretical propositions. It argues, first, that the charter should be construed to provide that disability pensions be paid from tax dollars; second, that payments for disability pensions can be split into two parts, one of which, paid entirely with tax money, discharges workmen's compensation; and, finally, that even if the deductions and taxes are commingled, we must assume that the funds are legally expended. We set forth the fallacies in these propositions.

The language of the charter does not support the city's first contention. The city says that the deduction provision of section 186½ "was originally intended to provide funds for the payment of pensions for years of service; and it was intended that the cost of other benefits be met by taxes" and that a "violation of Labor Code section 3751 was therefore

---

[7]As discussed *supra*, the commission reached a result in the *Healy* case different from that in *Morse*. In both, however, it apparently concluded that the city took a deduction from the employee's earnings.

In determining whether the city has taken a deduction from Fraide's earnings, the following arguments urged by the city are not germane: (1) the official who makes the 6 per cent pension deduction differs from the official who makes all "true deductions"; (2) the employee never physically receives any money which he returns to the city; (3) the pension fund is not a "trust."

impossible." Assuming such "intent," we nevertheless find no language in the charter that intimates that the disability pension must be paid only out of tax dollars.

In similar vein the city states that "Under its Charter the City could not lawfully obtain or use any other funds from any other source [than taxes] to make disability payments." Although, as the city contends, section 186, prior to 1959, provided that the city levy a tax in an amount equal to the estimated disability pensions, neither that section nor any other section of the charter required that disability pensions be paid out of tax dollars.

Having concluded that the charter provisions themselves cannot sustain the city's contention, we turn to its argument that we should allocate the funds so as to grant it a total credit against workmen's compensation liability. We recognize that the city correctly states that it need not "show that specific dollar bills were delivered to pay any specific obligation"; the trust fund with which we deal here is not a bucket of dollar bills; it is a legal and accounting concept. We must determine, therefore, which payments from this fund can be properly allocated to which sources.

The city presents a proposed method of allocation of the fund which, it claims, would entitle it to complete credit against any and all liability for workmen's compensation. It argues that the disability pension payment should be visualized as two separate parts: part one, an amount for the discharge of workmen's compensation liability, financed entirely by taxes, and part two, the "additional amount" paid for disability pensions, financed by taxes and employee contributions.[8]

The city contends that as long as the city's own contributions exceed part one it is entitled to a credit: in that event the employee contributions will only be used to cover the

[8]The city correctly states the general proposition that it may pay an amount in addition to workmen's compensation. (Lab. Code, § 3750.) Furthermore, a payment of money to an employee may, under some circumstances, satisfy the city workmen's compensation liability. (See *Bryant* v. *Industrial Acc. Com.* (1951) 37 Cal.2d 215 [231 P.2d 32]; payment of unemployment compensation benefits *Bulger* v. *Industrial Acc. Com.* (1933) 218 Cal. 716 [24 P.2d 796] payment of wages; *Evans* v. *Los Angeles Ry. Corp.* (1932) 216 Cal. 495 [14 P.2d 752] wages; cf. *Mercury Aviation Co.* v. *Industrial Acc. Com.* (1921) 186 Cal. 375 [199 P. 508]; *Stan* v. *California Golf Club* (1943) 8 Cal.Comp. Cases 209 [wages]; *Brooks* v. *City of Los Angeles* 61 L.A. [I.A.C.] 227-108 [wages required by ordinance].) In none of those cases, however, was the court or commission concerned with the applicability of Labor Code section 3751.

"additional amount." The city explains its argument: "Thus the express terms of the Labor Code sanction a contractual arrangement of the sort suggested. That is, if under agreement the employer pays one dollar on account of disability which includes the return of a penny invested by the employee, and if the same agreement provides 50 cents credit against a Labor Code award, the credit can hardly result in a 'contribution to compensation.' It is *absolutely impossible* for the credit to have the prohibited effect."[9]

The city, however, presents no reasoned approach as to why we should adopt this allocation. Both employee deductions and tax monies constitute sources for the pension fund.[10] When a disability pension is paid, it in fact consists of money from both sources. Artificially to allocate all the employee deductions to the "additional" amount and not to the portion which discharges workmen's compensation liability is merely to choose the desired result. It does not solve the issue.

The city finally contends that it "is in a position of 'quasi-trustee'" as to the deductions and that we must therefore presume, in view of *In re Hallett's Estate* (1880) 13 Ch. Div. 696, and *Elizalde* v. *Elizalde* (1902) 137 Cal. 634 [66 P. 369, 70 P. 861], that the disability pensions were paid only from tax dollars. As a further ramification of this contention the city urges that "it can hardly be presumed that the municipal officers expended funds improperly other than as authorized by Charter Section 186" or in violation of Labor Code section 3751. To state the problem in the terminology of presumptions, however, does not solve it; the claimed "presumptions" do no more than beg the question.

Indeed, *Elizalde* and *Hallett's Estate* do not apply to the instant situation. These cases illustrate the principle that if a trustee commingles trust funds with his own funds, and then withdraws money for his own use, the court will "presume" that he withdrew his own funds, not the trust funds. In the

---

[9]Section 182½ of the city charter does provide that the pension may be considered as two parts as outlined above. But once again the city fails to reveal any charter provision which requires that "part one" be paid *only* from tax dollars. Therefore, contrary to the city's conclusion, it is not "impossible" for employee deductions to be used to pay workmen's compensation. The city really asked that this court allocate the employee deductions solely to the "additional amount."

[10]From 1955 to 1962 the employee contributions were about $23,500,000. Tax contributions were about $52,770,000. Source: Annual Reports of Board of Pension Commissioners, Statement of Operations, 1955-1962.

first place in *Elizalde* and *Hallett's Estate* the court invoked the tracing presumption *against,* not in favor of, the person who commingled the funds. In the instant case, the city, the entity charged with holding and administering the funds through the Board of Pension Commissioners, seeks to invoke the presumption.[11] In the second place, the presumption of lawful withdrawal, as relied on in those cases, "is admittedly a fiction. . . . Instead of explaining the rule in terms of a presumption, it is more realistic to state that the rule [of allocation] is founded on the opinion of the court as to fairness and equity." (Bogert, Trusts and Trustees (1962) § 926, p. 346.)

Certainly in *Elizalde* and *Hallett's Estate,* the courts equitably charged the trustee's own funds with the withdrawals which he used for his own purposes. To have done less would have been to sanction unjust enrichment. But in the instant case any argument as to equities must beg the question. To require employees to pay for workmen's compensation with their own contributions would be both to violate Labor Code section 3751 and to work an injustice; to compel the employer twice to discharge its workmen's compensation liability would be to work a corresponding injustice. The very questions before us, however, are whether or to what extent the employees' deductions *do* pay for the workmen's compensation and whether or to what extent the employee receives "double recovery" for workmen's compensation. Our whole case turns on which money is to be allocated to which payment. "Presumptions" that the city officials must have "obeyed" the charter and the Labor Code do no more than furnish legal nomenclature to clothe an equitable result; they do not tell us what the equitable result should be. To select the tax monies, rather than the deductions, for the city's payment of the disability pensions in the name of equity adds nothing to the resolution of the problem.

If we uphold the city's system of employee deductions which can be used for disability pensions and permit the city a complete credit against its workmen's compensation liability, we encourage employers to set up hybrid funds composed of employee contributions and other funds for the pur-

---

[11] The city apparently is not seeking to invoke the presumption in order to upset the commission's finding that the source of the disability pensions is unascertainable. Rather the city seems to argue that the presumption compels us to hold, as a matter of law, that only tax funds were used to pay disability pensions.

pose of discharging compensation liability, even though the employer cannot show that employee contributions are not used for payment of benefits. Such a system would violate the legislative mandate as interpreted by *Healy* and offer a stratagem for the purpose of undermining the system of workmen's compensation long established in this state. The statute does not authorize us to condone such a result.

In brief, we cannot accept the approach suggested by the city because it effectively abrogates the mandate of Labor Code section 3751. On the other hand the city has substantially contributed to the pension fund. Moreover, we cannot properly sanction "double recovery" for the employee. Although we then apparently face a dilemma, the difficulty dissolves upon the realization that *to the extent* that the employee receives workmen's compensation benefits which consist of employee deductions he does not obtain "double recovery." Viewed in this light the proper method becomes clear. We must regard each dollar which is paid out of the pension fund as consisting in part of tax monies and in part of employee contributions.

The city, therefore, should receive a partial credit against workmen's compensation liability for the disability pension it pays each employee. The credit should bear the same ratio to workmen's compensation liability as the "city's contributions" bears to the "total contributions." For example, if monthly workmen's compensation liability to an employee is $120 and the ratio of "city's contributions" to "total contributions" is 3:4, then the city is entitled to a credit of $90.[12]

We cannot determine from the record of the instant case the exact credit which should be allowed to the city. We therefore remand the case to the commission to determine the amount of such credit. The commission, on remand, should determine the "employee contributions" the "city's contributions," and the "total contributions." The "total contributions" are the sum of the "employee contributions" and the "city's contributions." The "city's contributions" are the aggregate tax monies paid into the pension fund during the years Fraide was employed by the city as a policeman and paid into the fund. "Employee contributions" are the

---

[12]The method of proportionate allocation of commingled properties is not unknown to the courts of this state. See, e.g., *Title Ins. & Trust Co.* v. *Ingersoll* (1910) 158 Cal. 474, 490 [111 P. 360]; *Horr* v. *Barker* (1858) 11 Cal. 393, 403-404 [70 Am.Dec. 791]; *Harris* v. *Hensley* (1927) 83 Cal.App. 283 [256 P. 832].

aggregate deductions paid into the fund by all firemen and policemen during those years.[13] The commission must look to the total deductions from all firemen and policemen because to fail to do so would be to disregard the basic nature of the disability pension system which must be to provide a system of insurance. Many members pay into the fund and are never injured. The city may not use the particular deductions they contribute to the fund to pay workmen's compensation liability any more than it can use Fraide's.[14]

We believe that the situation compels the adjustment we have outlined. Here the city has chosen a questionable method of handling the employees' contributions. Here the city itself has commingled the employee contributions with tax monies in a fund from which disability pensions are paid. Surely the city cannot insist that the employees' contributions be ignored. Thus, we cannot allow the city a total credit against workmen's compensation pursuant to its charter. On the other hand, we cannot overlook the fact that the city's tax monies constitute an important source for the pension fund. To permit the city a partial credit against workmen's compensation is to dispose of the case upon the basis of the exact equities of the contending parties.

The award is annulled and the cause remanded to the Industrial Accident Commission for proceedings consistent with this opinion.

Traynor, C. J., McComb, J., Peters, J., Peek, J., Mosk, J., and Burke, J., concurred.

---

[13]If data is not available for all the relevant years the commission may use the data from the years that it is available.

[14]The city raises one other minor contention. It questions the commission's authority to order attorney's fees deposited in trust. On January 2, 1964, the referee awarded $2,500 in attorney's fees to be deducted from the award to Fraide. Panel Two of the commission affirmed the referee's award on July 6.

The panel thereupon issued the following order: "We do not know what effect the award made in this matter will have on applicant's future right to pension benefits; consequently, we cannot tell at this time whether there will be a net gain to applicant as between workmen's compensation and pension benefits. For this reason the fees awarded to applicant's attorneys herein shall be deposited in a trust fund mutually satisfactory to applicant's attorneys and defendant."

The city admits that the commission may allow a lien against compensation for attorney's fees and may order payment of the lien in lump sum. It argues, however, that the commission has no authority to compel the city, a legally uninsured employer, to secure the payment by depositing a sum in a trust fund. The purpose of the commission's order, however, is not to ensure the city will pay the award but rather that Fraide receive substantial benefits *before* his attorneys are paid. The city's attack on the commission's authority must therefore fail.