[No. A056899. First Dist., Div. Four. Sept. 29, 1993.]

KAISER FOUNDATION HEALTH PLAN, INC., Plaintiff and Appellant,
v.
LIFEGUARD, INC., Defendant and Respondent.

1754

**COUNSEL**

Kennedy P. Richardson and Mark Palley for Plaintiff and Appellant.

Rankin, Center, Luckhardt & Lund, Gary S. Vendeweghe and Holly E. McCann for Defendant and Respondent.

**OPINION**

**PERLEY, J.**—This case is a dispute between two health care service plans over which must pay for emergency medical services rendered to a patient who was covered under both plans. Kaiser Foundation Health Plan, Inc., paid for the services and sued Lifeguard, Inc., for reimbursement. The trial court found that Kaiser was responsible for all of the costs in question and entered judgment for Lifeguard, from which Kaiser appeals. We conclude that each side is responsible for one-half of the costs and therefore reverse.

I.

The case was tried to the court on stipulated facts. Michael Bozzo suffered a heart attack in June of 1990. At the time, he was enrolled in Kaiser through his employer, and he was covered as a dependent by Lifeguard through his wife's employer. He received emergency treatment costing $132,517.91 at hospitals unaffiliated with Kaiser. Kaiser proposed to Lifeguard that they split the costs of Bozzo's treatment 50/50. Lifeguard responded that Kaiser was solely responsible for the costs; Kaiser paid for them; and Kaiser sued Lifeguard to recoup the payment.

## II.

Kaiser and Lifeguard are health care service plans governed by the Knox-Keene Health Care Service Plan Act of 1975 (Health & Saf. Code, § 1340 et seq.) and regulated by the Department of Corporations (Health & Saf. Code, § 1341). The Kaiser plan and the Lifeguard plan each stipulate that the other is required to pay for Bozzo's treatment. The problem is one of "coordination of benefits" where there is duplicate health care coverage. (See generally Helitzer, *Coordination of Benefits: How and Why It Works* (1991) 4 Benefits L.J. 411.) Standard rules have evolved in this area to help prevent the kind of dispute presented here. (*Id.*, at p. 412 [stating that uniform rules for coordination of benefits are "absolutely essential"]; Watson et. al., *Coordination of Benefits* (ALI-ABA 1990) [citing the need for a "universal order of benefit determination"].)

At the time of Bozzo's treatment, Kaiser's plan provided that emergency services received by a member from providers not affiliated with Kaiser were to be paid first from any other insurance the member had. The agreement stated that: "The amount otherwise payable is reduced by . . . all amounts paid or payable, or which in the absence of this Agreement would be payable, for the Emergency Services in question, under any insurance policy or contract, or any other contract . . . ." Apart from this "out-of-plan" reduction for emergency services, Kaiser did not coordinate benefits with other insurers. Kaiser evidently bore the entire cost of services rendered by Kaiser providers regardless of other insurance. When Lifeguard declined to cover Bozzo's treatment, Kaiser paid for the treatment in accordance with its agreement to cover out-of-plan emergency care "if the other source of coverage has denied the claim . . . ."

Lifeguard, on the other hand, provided for coordination of benefits generally, and under Lifeguard's rules Kaiser was liable for Bozzo's treatment. Lifeguard's plan stated that: "If another plan does not provide for coordination of its benefits with the benefits of this Plan, it will always determine [pay] its benefits before this Plan." Lifeguard's plan further stipulated that: "The benefits of a plan which covers the person on whose expenses [the] claim is based other than as a dependent shall be determined before the benefits of a plan which cover[s] such person as a dependent." Lifeguard's provisions are consistent with Department of Corporations (DOC) regulations (Cal. Code Regs., tit. 10, § 1300.67.13 [hereinafter regulation 1300.67.13]) on coordination of benefits (COB), and there is no dispute about their validity or operation.

The dispute is about the validity of Kaiser's out-of-plan reduction provision. Subdivision (b) of regulation 1300.67.13 specifies standard COB provisions to be used by health care service plans that elect to coordinate

benefits. Subdivision (a)(1) of regulation 1300.67.13 states that "COB provisions, or provisions for the reduction of benefits otherwise payable because of other coverage by whatever name designated, which are not consistent with the standard provision set forth in subdivision (b), may not be used . . . ." Regulation 1300.67.13, subdivision (b) does not include any provision for out-of-plan reductions like the one Kaiser seeks to enforce here. Since Kaiser's out-of-plan reduction provision is "not consistent with the standard provision set forth in subdivision (b)," the trial court concluded in accordance with subdivision (a)(1) that it could "not be used." (Reg. 1300.67.13, subd. (a)(1).)

## III.

Kaiser contends that its out-of-plan reduction provision is valid, notwithstanding the DOC's COB regulation, because it is authorized under 1982 amendments to Insurance Code section 10270.98 (hereinafter section 10270.98). This statute, with the language added in 1982 (Stats. 1982, ch. 1066, § 1, pp. 3844-3845) italicized,[1] reads as follows:

"Group disability policies may provide, among other things, that the benefits payable thereunder are subject to reduction if the individual insured has any other coverage (other than individual policies or contracts) providing hospital, surgical or medical benefits, whether on an indemnity basis or a provision of service basis, resulting in such insured being eligible for more than 100 percent of the covered expenses.

"Except as permitted by this section and by Section 10323, 10369.5, 10369.6, or 11515.5, *and except in the case of group practice prepayment plan contracts which do not provide for coordination of benefits, to the extent they provide for a reduction of benefits on account of other coverage with respect to emergency services that are not obtained from providers that contract with the plan,* no group or individual disability insurance policy or service contract issued by nonprofit hospital service plans operating under Chapter 11A (commencing with Section 11491) of Part 2 of Division 2 shall limit payment of benefits by reason of the existence of other insurance or service coverage.

"The policy provisions authorized by this section shall contain a provision that payments of funds may be made directly between insurers and other

---

[1]The bracketed portions, added to the statute in 1986 (Stats. 1986, ch. 638, § 2, pp. 2151-2152), are irrelevant to the appeal.

providers of benefits. Such policy provisions shall also contain a provision that if benefits are provided in the form of services rather than cash payments the reasonable cash value of each service rendered shall be deemed to be both an allowable expense and a benefit paid. The reasonable cash value of any contractual benefit provided to the insured in the form of service rather than cash payment by or through any hospital service organization or medical service organization or group-practice prepayment plan shall be deemed an expense incurred by the insured for such service, whether or not actually incurred, and the liability of the insurer shall be the same as if the insured had not been entitled to any such service benefit, unless the policy contains a provision authorized by Section 10323, 10369.5, or 10369.6 in the case of an individual disability policy, or by this section, in the case of a group disability policy.

"This section shall not be construed to require that benefits payable under group disability policies be subject to reduction by the benefit amounts payable under Chapter 3 (commencing with Section 2800) of Part 2 of Division 1 of the Unemployment Insurance Code.

*"The provisions of this section, and all regulations adopted pursuant thereto pertaining to coordination of benefits with other group disability benefits, shall apply to all employers, labor-management trustee plans, union welfare plans (including those established in conformity with 29 U.S.C. Sec. 186), employer organization plans or employee benefit organization plans, health care service plan contracts, pursuant to regulations adopted by the Commissioner of Corporations which shall be uniform with those issued under this section for those plans that elect to coordinate benefits, group practice, individual practice, any other prepayment coverage for medical or dental care or treatment,* [and administrators, within the meaning of Section 1759] *not otherwise subject to the provisions of this section whenever such plan, contract or practice provides* [or administers] *hospital, surgical, medical or dental benefits to employees or agents who are also covered under one or more additional group disability policies which are subject to this section or health care service plans."*

The trial court determined that section 10270.98 "governs group disability policies issued by insurance companies under the jurisdiction of the Insurance Commissioner and not health care service plans under the jurisdiction of the Commissioner of Corporations. It is inapplicable to this dispute between two health care service plans." Kaiser argues, however, that the paragraph added at the end of the statute in 1982 made it applicable to health care service plans generally, and that the clause added to the second paragraph in 1982 covers Kaiser's out-of-plan reduction provision, and exempts it from other COB rules.

 "Our analysis starts from the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent. . . . In determining intent, we look first to the words themselves. . . . If the statutory language is clear and unambiguous, there is no need for construction." (*Viking Pools, Inc.* v. *Maloney* (1989) 48 Cal.3d 602, 606 [257 Cal.Rptr. 320, 770 P.2d 732], citations omitted.) The statutory language is not clear and unambiguous in this instance.

 The clause in question exempts "group practice prepayment plan contracts which do not provide for coordination of benefits, to the extent they provide for a reduction of benefits on account of other coverage with respect to emergency services that are not obtained from providers that contract with the plan," from limits on the reduction of benefits because of other insurance. Kaiser's out-of-plan reduction provision falls squarely within the terms of this clause if the Kaiser plan is a "group practice prepayment plan contract." Since Kaiser is an "archetypal example" of "prepaid group practice" (Comment, *The Role of Prepaid Group Practice in Relieving the Medical Care Crisis* (1971) 84 Harv.L.Rev. 889, 910-911), it is a "group practice prepayment plan" as those words are ordinarily understood.

However, the language of the paragraph in which the clause appears suggests that, as used in the clause, the words "group practice prepayment plan contract" may have a narrower than ordinary meaning. The clause is one of a number of exceptions to a rule limiting reduction of benefits in a "group or individual disability insurance policy or service contract issued by nonprofit hospital service plans operating under Chapter 11A (commencing with Section 11491) of Part 2 of Division 2 [of the Insurance Code] . . . ." Since the exception cannot be broader than the rule, the exception for "group practice prepayment plan contracts" applies on its face only if the contract is either a "disability insurance policy" or a "service contract issued by a nonprofit hospital service plan [regulated under the Insurance Code]." Kaiser's contract falls into neither category.

The second paragraph of the statute could plausibly be limited to these two categories. It appears that group practice prepayment plan contracts are not disability insurance policies, but that such contracts can be issued by nonprofit hospital service plans regulated under the Insurance Code. It is evidently agreed that when the exception for group practice prepayment plan contracts was added to the statute in 1982, at least one entity, TakeCare Corporation, was a prepaid, group practice, nonprofit hospital service plan licensed under chapter 11A of the Insurance Code. Thus, the structure of the

second paragraph of section 10270.98 tends to support Lifeguard's argument that only nonprofit hospital service plans regulated under the Insurance Code are entitled to the group practice prepayment plan contract exception.

On the other hand, the 1982 amendments to the statute as a whole tend to support Kaiser's claim that health care service plans are also entitled to this exception. Before 1982, the statute referred mainly to disability insurance policies. The 1982 amendments added a paragraph to the end of the statute that made the provisions of "this section," presumably meaning the statute as a whole, applicable to various entities such as "all employers," and to various contracts, such as "health care service plan contracts," that were not previously covered. The Legislature did not go back and amend any of the language in the first four paragraphs that referred only to disability policies. However, Kaiser argues that the Legislature must have intended that the first four paragraphs be applied to all of the entities and contracts listed in the fifth paragraph. If that were the case, then health care service plans like Kaiser, and not just nonprofit hospital service plans regulated under the Insurance Code, would have the benefit of the exception in the second clause of the second paragraph for group practice prepayment plan contracts.

Kaiser submits that any other construction of the statute as a whole would lead to unreasonable results. (See *Granberry* v. *Islay Investments* (1984) 161 Cal.App.3d 382, 388 [207 Cal.Rptr. 652] [such results are to be avoided].) The fourth paragraph, for example, states that benefits payable "under group disability policies" are not to be reduced by benefits payable under the Unemployment Insurance Code. Although this paragraph only mentions disability policies, it presumably applies to health care service plans as well. If it did not, then, as Kaiser notes, it could be read by negative inference to require that health care service plans reduce their benefits on account of unemployment compensation.

Thus, the wording of the second clause of the second paragraph of section 10270.98 appears to permit Kaiser's out-of-plan reduction provision; the wording of the second paragraph as a whole appears to preclude it; and the wording of the statute as a whole appears to permit it. While this analysis does not address all of the arguments advanced by the parties on the basis of statutory language,[2] it is sufficient to demonstrate that section 10270.98 is ambiguous. The statute's applicability to Kaiser's out-of-plan reduction provision is not readily apparent from the language the Legislature used.

---

[2] In addition to arguments about clauses and paragraphs of the section in question, the parties advance arguments about individual words and about other statutes.

Lifeguard contends that if the Legislature intended to apply the second clause of the second paragraph of Insurance Code section 10270.97 to health care service plans, then it would have

## IV.

Statutes are to be interpreted in accordance with their apparent purpose (see 2A Sutherland Statutory Construction (5th ed. 1992) § 45.05, p. 22 and authorities cited), and various extrinsic aids, including the history of the statute, committee reports and staff bill reports may be used to determine the intent of the Legislature (see *People* v. *Superior Court (Arthur R.)* (1988) 199 Cal.App.3d 494, 499 [244 Cal.Rptr. 841]; *Noroian* v. *Department of Administration* (1970) 11 Cal.App.3d 651, 655 [89 Cal.Rptr. 889]). Such aids are especially helpful in a case like this where the wording of the statute is unclear.

Kaiser has presented various documents from the legislative history of the 1982 amendments to section 10270.98, and asked us to take judicial notice of them. These materials were not before the trial court, and the general rule is that an appellate court should not take judicial notice of matters that have not been presented to and considered by the trial court in the first instance. (See *People* v. *Hardy* (1992) 2 Cal.4th 86, 134 [5 Cal.Rptr.2d 796, 825 P.2d 781]; *Coy* v. *County of Los Angeles* (1991) 235 Cal.App.3d 1077, 1083, fn. 3 [1 Cal.Rptr.2d 215].) However, Lifeguard has not opposed the motion for judicial notice, and it has referred extensively to Kaiser's materials in its brief. The motion has therefore been granted.

The 1982 amendments to section 10270.98 originated from Senate Bill No. 2024, 1981-1982 Regular Session. Under the bill as originally passed by the Senate, Knox-Keene Act health care service plans were exempted from the statute. (Sen. Amend. to Sen. Bill No. 2024 (1981-1982

---

used those words in the clause, rather than the words "group practice prepayment plan[s]." Kaiser responds that not all health care service plans are organized on the group practice model, where members contract to be treated by a particular group of physicians. (See Health & Saf. Code, § 1345, subd. (f).) Since the clause applies only to emergency services "not obtained from providers that contract with the plan," it makes sense that the scope of the clause would be limited to those health care service plans that are group practice prepayment plans.

Lifeguard notes that various statutes outside the Insurance Code refer to "group practice prepayment health care service plan[s]." (See, e.g., Civ. Code, § 56.05, subd. (d).) These statutes are cited for the proposition that group practice prepayment plans are not synonymous with health care service plans regulated under the Knox-Keene Act. However, Kaiser does not contend that the two types of plans are synonymous. Kaiser's argument is that, as used in the second clause of the second paragraph of section 10270.98, the term "group practice prepayment plan" covers Knox-Keene plans only if they are organized, like Kaiser, on the group practice model. Kaiser also acknowledges that the clause could apply to hospital service plans regulated under the Insurance Code if they offer prepaid, group practice medical services.

Even this does not exhaust the arguments of inventive counsel, but the bottom line is that arguments based on statutory language are inconclusive in this instance.

Reg. Sess.) May 4, 1982.) However, the bill was amended in the Assembly to have the statute cover "health care service plan contracts, pursuant to regulations adopted by the Commissioner of Corporations which shall be uniform with those issued under this section for those plans that elect to coordinate benefits." (Assem. Amend. to Sen. Bill No. 2024 (1981-1982 Reg. Sess.) Aug. 2, 1982.) At the same time this language was added to the last paragraph of the statute, the language at issue in this appeal covering "group practice prepayment plan contracts" was added to the second paragraph. (*Ibid.*)

The timing of the Assembly amendment supports Kaiser's position. It appears that the Legislature was focusing on health care service plans when it added the reference to group practice prepayment plan contracts to the second paragraph, and thus that the second paragraph's exception for group practice prepayment plan contracts was meant to apply to health care service plans like Kaiser. The DOC comments on Senate Bill No. 2024 also support this interpretation.

In June of 1982, William Kenefick, DOC senior corporations counsel and legislative coordinator, wrote to the bill's sponsor, Senator Maddy, with comments on behalf of the DOC. Under the bill at that point, health care service plans (HCSPs) licensed under the Knox-Keene Act were exempted from the statute. Anticipating the Assembly amendment that would bring HCSPs within the statute, the DOC objected that "there is no valid reason to force HCSPs to be subject to regulatory provisions not set forth in the Knox-Keene Act or the regulations thereunder. We also believe that any attempt to force HCSPs to coordinate benefits would damage the HCSP movement. . . .

"· · · · · · · · · · · · · · · · · · · · · · · ·

"No HCSPs should be forced to coordinate benefits, because HCSPs arrange for the provision of services and, accordingly, ordinarily lack the administrative and financial capacity to provide monetary payments to members and ordinarily lack any contractual obligation to do so."

On August 2, 1982, Kenefick proposed to Senator Maddy that COB rules for HCSPs be added to Knox-Keene Act provisions in the Health and Safety Code, rather than to section 10270.98. Kenefick enclosed the text of a new Health and Safety Code section 1373.8, which he said would "resolve the Department's concerns." The text of the DOC's proposed statute is set forth

in the margin.[3] On the same day the DOC proposed this statute for HCSPs, the Assembly amended Senate Bill No. 2024 and dropped language into the second paragraph of section 10270.98 which was virtually identical in form and substance to the DOC's language highlighted in the footnote. Again, the timing of the amendment suggests that the second clause of the second paragraph of section 10270.98 was meant to apply to HCSPs.

This was the DOC's understanding. In its report urging a veto of the enrolled bill, the DOC explained that: "A group practice prepayment contract [may under the bill provide] for a reduction of benefits on account of other coverage for emergency services not obtained from contracting providers. *Any other HCSP group contract* which does not coordinate benefits would be prohibited from limiting payment of benefits on account of the existence of other coverage . . . ." (Cal. Dept. of Corp. Enrolled Bill Rept. on Sen. Bill No. 2024 (1982) pp. 1-2.) The DOC's enrolled bill report further reasoned that group practice HCSP's might opt to "comply with" or "take refuge in" the clause in question. (*Id.*, at p. 2.) The DOC thus interpreted the 1982 amendment to the second paragraph of section 10270.98 to apply to HCSPs within its jurisdiction.

The DOC's interpretation supports Kaiser's argument and it is entitled to great weight. ▮ Contemporaneous construction of a new enactment by an agency charged with its enforcement is persuasive, if not controlling. (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1388 [241 Cal.Rptr. 67, 743 P.2d 1323].) "The construction of a statute by the officials charged with its administration must be given great weight, for their 'substantially contemporaneous expressions of opinion are highly relevant and material evidence of the probable general understanding of the times and of the opinions of men [and women] who probably were active in the drafting of the statute.'" (*Whitcomb Hotel, Inc.* v. *Cal. Emp. Com.* (1944) 24 Cal.2d 753, 756-757 [151 P.2d 233, 155 A.L.R. 405].)

▮ Nothing in the legislative history supports a contrary interpretation. Lifeguard seizes upon the highlighted words in the following excerpt from the enrolled bill report of the Department of Insurance: "Under existing law *group or individual disability insurance policies or service contracts issued by*

---

[3]"A health care service plan group contract may or may not coordinate benefits. *A group practice prepayment plan group contract which does not coordinate benefits may provide for a reduction of benefits on account of other coverage with respect to emergency services that are not obtained from providers that contract with the plan.* A group contract which does coordinate benefits shall do so pursuant to regulations adopted by the Commissioner which shall be uniform with regulations of the Insurance Commissioner adopted pursuant to Section 10270.98 of the Insurance Code."

*nonprofit hospital service plans are prohibited* from limiting payment of benefits by reason of the existence of other insurance or service coverage, except as permitted by specified sections of the Insurance Code. [¶] This bill would add to those matters excepted *from that prohibition*, group practice prepayment plan contracts which do not provide for coordination of benefits, to the extent they provide for a reduction of benefits on account of other coverage with respect to emergency services that are not obtained from providers that contract with the plan." (Cal. Dept. Ins. Enrolled Bill Rep. on Sen. Bill No. 2024 (1982) pp. 1-2.)

Lifeguard reads the words "from that prohibition" to refer to the prohibition on disability policies and nonprofit hospital service plans. This would suggest that the Department of Insurance interpreted the group practice prepayment plan exception to apply only to those policies and hospital plans. But as used in the foregoing passage, the words "from that prohibition" could just as well refer to any limitation on the reduction of benefits because of other coverage. If that were the case, then the exception for group practice prepayment plans would not necessarily be limited to disability policies and nonprofit hospital service plans. The point is at best ambiguous, and there is no other evidence that the Department of Insurance disagreed with the DOC's interpretation of the bill.

Accordingly, we conclude that the second clause of the second paragraph of Insurance Code section 10270.97 covers HCSPs like Kaiser that are "group practice prepayment plan contracts." This clause was added with HCSPs in mind, and by allowing group practice HCSPs to shift the cost of out-of-plan emergency services notwithstanding other COB rules, it at least partially addressed the DOC's concern that HCSPs should not be forced to coordinate benefits.[4] Kaiser's plan does "not provide for coordination of benefits" generally, but it does "provide for a reduction of benefits on account of other coverage with respect to emergency services that are not obtained from providers that contract with the plan." Thus, Kaiser's claim

---

[4]Lifeguard observes that Blue Cross was the primary supporter of Senate Bill No. 2024, and that Blue Cross's affiliate TakeCare Corporation stood to benefit from an out-of-plan emergency services exception, even if that exception was limited to the narrow range of group practice prepayment plan contracts that were issued by nonprofit hospital service plans. But apart from suggesting that this portion of the bill was a form of special interest legislation, Lifeguard offers no reason why the Legislature would have wanted to create such a narrow exception to normal COB rules.

Insofar as Lifeguard's brief stresses "the dire importance of uniformity" in COB provisions, the answer is that the Legislature saw fit to create an exception to normal COB rules in one specific situation. Uniformity would be sacrificed in any event, even under Lifeguard's limited reading of the second clause of the second paragraph of section 10270.98, with respect to entities like TakeCare.

for the cost of Bozzo's emergency treatment is authorized by the second clause of the second paragraph of section 10270.98. With the benefit of legislative history that was not presented below, we hold that the trial court erred in concluding otherwise.

## V.

We further conclude that Kaiser's out-of-plan reduction provision is not prohibited by the DOC's COB regulation. As previously noted, regulation 1300.67.13, subdivision (a)(1) states in broad terms that "COB provisions, or provisions for the reduction of benefits otherwise payable because of other coverage by whatever name designated" cannot be used if they are inconsistent with standard provisions set forth elsewhere in the regulation. Since these standard provisions do not authorize reduction of benefits for out-of-plan emergency services, the regulation appears to conflict with the second clause of the second paragraph of section 10270.98 and to preclude such a reduction.

However, it is apparent from the terms of section 10270.98 that Kaiser is not subject to the regulation. The last paragraph of the statute, with emphasis added, states that its provisions limiting reduction of benefits shall apply to "health care service plan contracts, pursuant to regulations adopted by the Commissioner of Corporations which shall be uniform with those issued under this section *for those plans that elect to coordinate benefits*." As the DOC noted in its enrolled bill report on Senate Bill No. 2024, only "HCSPs electing to coordinate benefits would be subject to the B regulations of the Commissioner of Corporations." (Cal. Dept. of Corp. Enrolled Bill Rep. on Sen. Bill No. 2024, *supra*, at p. 1.) Kaiser did not "elect to coordinate benefits" within the meaning of section 10270.98 by adopting an out-of-plan reduction provision for emergency services.

This is evident from the language of the second clause of the second paragraph of the statute which, again, provides an exception to normal COB rules "in the case of group practice prepayment plan contracts which do not provide for coordination of benefits, to the extent they provide for a reduction of benefits on account of other coverage with respect to emergency services that are not obtained from providers that contract with the plan." Under this language, group practice prepayment plan contracts can include an out-of-plan reduction provision for emergency services without being deemed to "provide for coordination of benefits." This is precisely what Kaiser has done here. Accordingly, the trial court erred when it found that Kaiser's out-of-plan reduction provision was subject to the DOC's COB

regulation. It is not subject to that regulation, and that regulation is not in conflict with section 10270.98.

## VI.

█ Kaiser and Lifeguard both lawfully provide that the other is primarily liable for the cost of Bozzo's emergency services. Kaiser's out-of-plan reduction provision is valid under the second clause of the second paragraph of section 10270.98.[5] Lifeguard's provision making it secondary when it covers the insured as a dependent is valid under the standard COB regulations authorized by this statute. (Reg. 1300.67.13, subd. (b)(4)(A).) Kaiser suggests that Lifeguard's provision should not be enforced because Kaiser's provision has "legislatively sanctioned priority," but no authority is cited for this proposition and nothing in the statutory scheme supports it. Both provisions are equally valid.

In these circumstances, to avoid a result where the plans would cancel each other out, the cost of Bozzo's emergency services should be prorated among the parties. (See *Employers Reinsurance Corp.* v. *Phoenix Ins. Co.* (1986) 186 Cal.App.3d 545, 557 [230 Cal.Rptr. 792].) Accordingly, Lifeguard is liable to Kaiser for one-half of the cost of the services.

## VII.

The judgment for Lifeguard is reversed with instructions to enter judgment for Kaiser in the sum of $66,258.95. Kaiser shall recover its costs on appeal.

Anderson, P. J., and Reardon, J., concurred.

---

[5]In view of this conclusion, we do not reach Kaiser's argument that the reduction provision is valid because the DOC effectively approved it when it reviewed Kaiser's 1990 contract.