[No. G014837. Fourth Dist., Div. Three. Apr. 4, 1996.]

PAUL McGILL, Plaintiff and Respondent, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Defendant
and Appellant.

**COUNSEL**

James E. Holst, Christine Helwick, Eric K. Behrens, Hagenbaugh & Murphy, Alan R. Zuckerman, Greines, Martin, Stein & Richland and Marc J. Poster for Defendant and Appellant.

Donald K. Hufstader for Plaintiff and Respondent.

**OPINION**

**WALLIN, J.**—The Regents of the University of California appeal a judgment granting a writ of administrative mandamus (Code Civ. Proc.,

§ 1094.5) directing the Chancellor of the University of California at Irvine (collectively the University) to set aside a decision to deny tenure to mathematics professor Paul McGill. The University contends substantial evidence supports its decision and issuance of the writ was improper. We agree.

McGill received his Ph.D. in mathematics in Ireland in 1973 when he was 25 years old and held various academic posts throughout Europe. Well into his career, he specialized in probability studies. He was hired by the University in 1987 as an untenured assistant professor, step IV, of mathematics. In 1989, he was promoted to assistant professor, step V. During that same academic year a tenure review was begun, but suspended. In the University's faculty system, an untenured professor is appointed for two years at a time and may serve at most for eight years. If the professor is not granted tenure, he or she is given a "non-reappointment" and allowed to remain for one final year before leaving the University.

*Tenure Review*

A second tenure review of McGill commenced in the fall of 1990.[1] The mathematics department reviewed McGill's file and recommended against tenure. The majority of McGill's outside reviewers had given him very favorable reviews. Several commented that McGill should have been given tenure at the outset of his employment because of his international stature as a probabilist and previous academic experience. Only one outside reviewer was negative, stating McGill's work had not had the kind of impact which would justify tenure at the University. A department ad hoc committee formed to review McGill's case made two recommendations. The majority recommendation was to deny tenure because McGill's work since his doctorate, 17 years earlier, had not been significant, and there were others in his field who showed greater promise as probabilists. The majority concluded McGill had not interacted well with graduate students and his teaching was

---

[1] The procedure is elaborate and only briefly summarized. A file on the tenure candidate containing confidential review letters from outside the University and other information pertaining to the relevant criteria for tenure including teaching, research, professional activity, and university and public service, is prepared by the department chairperson. That file is made available to the candidate and department faculty for review. The department reviews the case and makes a recommendation to the dean of the school. The dean reviews the file and departmental recommendation and in turn makes a recommendation to the chancellor. The chancellor forwards the file to the University's personnel committee and an ad hoc review committee, both of which make recommendations to the chancellor. The chancellor reviews each set of recommendations and makes a final decision. If it is adverse, the candidate may seek review by the personnel committee, which makes a recommendation to the chancellor, who acts on the appeal.

"only adequate at best." The dissenting member concluded McGill should be granted tenure because his published work had been very influential. In January 1991, 23 of 25 tenured mathematics department faculty voted against tenure for McGill and recommended he be nonreappointed.

The mathematics department chairperson, Professor Ronald Stern, submitted his recommendation that McGill not be tenured and favoring nonreappointment. He found McGill's work lacked the impact of other mathematicians of equal experience. McGill had not attracted outside funding, had not interacted well with the department's probability group, had not been very successful as a teacher, and had given limited service to the University. His only department service had been to train technical typists on a word processing system. Stern noted the mathematics department had made very marginal tenure appointments in the past and had to be very careful about its new appointments. He commented this was not the "ordinary tenure review case of a young promising mathematician," but rather the review of someone who had been in his career for 17 years, and nothing suggested McGill's research or impact on his field would significantly change in the future. Stern also commented, "Another important criteria for a tenure case is **Collegiality**. It is here that I also find Paul McGill deficient. During our recruitment during the past two years, [he] has insisted on talking with the candidates in private. On two occasions the candidates have called me and inquired as to why [he] was so negative and denigrating [of] some of our valued faculty." The dean of the physical sciences school also recommended against tenure.

McGill's case was next reviewed by an ad hoc committee appointed by the University's committee on academic personnel (the CAP). McGill requested the entire mathematics department be excluded from this committee because he believed its decision was prompted by personal animosity of a few faculty members. The University allowed him to exclude 23 of 28 faculty members. When McGill complained about the omission of letters of recommendation which were part of his first halted tenure review, the dean agreed to include them.

In May 1991, the CAP ad hoc committee recommended McGill be promoted to the untenured position of assistant professor, step VI and be reconsidered for tenure in two years. The committee noted the file on McGill was confused and confusing and failed to candidly address some of the key issues. The committee report analyzed McGill's fulfillment of each of the criteria for tenure: teaching, research, professional activity, and University and public service. In research, the committee noted all but one of the

outside letters were strongly positive, and "it is difficult to draw any conclusion other than that [McGill] is an internationally recognized scholar in probability theory." His lack of external funding was not a barrier to his status and impact on the field. As for teaching, the most recent student evaluations showed McGill was ranked second on the faculty, a conclusion the department and the University contest. The committee found McGill had shown a reasonable level of professional activity, having attended several professional meetings, but his service to the University was minimal. In conclusion, the committee believed undue weight had been accorded the single negative outside recommendation, and "[i]n trying to unravel the file and arrive at a judgment, we can't avoid the impression that personal friction may be influencing the decision to terminate." The CAP followed the recommendation of its ad hoc committee that McGill be elevated to assistant professor, step VI and be reconsidered for tenure in two years. The CAP chastised the mathematics department that collegiality was not a proper consideration, and that its file had been very poorly prepared.

In June, both the mathematics department and the dean prepared responses to the CAP report, denying that collegiality was anything more than a passing consideration. The mathematics department noted that although there had been praise for McGill's work preceding his employment at the University, his file was not strong for tenure and anything other than nonreappointment would be putting off the inevitable.

In July, the University's vice-chancellor recommended against tenure and for nonreappointment. The vice-chancellor noted the file contained many positive things about McGill and thought the record suggested personal friction might be influencing the mathematics department's decision. But the vice-chancellor also found most of McGill's significant work was accomplished before he came to the University and there was no demonstration of any significant achievements while at the University.

In August, the chancellor denied tenure and gave McGill notice of his nonreappointment, terminating his employment at the University at the conclusion of the 1991-1992 academic year. Noting that at all levels of review tenure was not recommended (the CAP recommendation was for reappointment and reconsideration in two years), the chancellor stated his decision for nonreappointment was made in light of those recommendations.

---

*University Appeal Process*

In September 1991, McGill appealed the chancellor's decision to the CAP. He complained that his file contained errors regarding the dates of publication of several articles which made it appear they were from an earlier review period. He also complained the action against him had been the result of a personal bias. His appeal was granted.

McGill submitted additional materials including new teaching evaluations, articles and a list of errors in the dates of his publication list. In his written statement, McGill explained why he believed there was animosity towards him. He had been recruited to the University by Professor Rene Carmona and another professor. Both told him the University could not offer a tenured position at the time, but assured him he would receive his tenure after his first year, so he accepted the untenured position. But at his first review, he was not considered for tenure, only a step increase. The only reason given was that his teaching evaluations were weak. In the middle of McGill's second year at the University, Professor Carmona inexplicably accused him of having presented the work of other mathematicians as his own. Carmona could not prove the accusations, but "became openly abusive to McGill." McGill spoke to Professor Stern about Carmona's attacks, and was assured everything would be fine. He recommended McGill go on leave for the fall 1990 term to do research. McGill agreed. Stern then informed McGill one of the criteria for tenure was collegiality and, therefore, McGill would have to do some research work for Carmona or he would be terminated. McGill refused.

The mathematics department reconsidered McGill's case. Stern advised the department that McGill's statement regarding his dates of publication were correct. After confidential voting by the entire tenured faculty, the mathematics department again voted against tenure and for nonreappointment. One faculty member anonymously wrote on a ballot that McGill deserved tenure, but faced personal animosity from two professors who "try to prove their case in the departmental meetings." Stern's letter to the chancellor acknowledged those comments: "I know that Paul McGill has had some mathematical disagreements with two of our faculty members and that they are not the best of friends. However all of the voting faculty, including these two professors, have carefully reviewed [his] file and made judgements [*sic*] based on [the] quality of research mathematics, teaching, and service, and that [*sic*] no personal animosity was evident in any of the discussions of this case."

The dean concurred in the mathematics department's recommendation, commenting that although "McGill has been caught up in a series of circumstances that have played negatively upon his future at UCI," it would nonetheless be a mistake to promote him. The dean stated that while the outside evaluations were favorable, they did not describe an outstanding scholar. McGill's teaching and service to the University were "OK" but no more, which was insufficient to warrant a tenured position. The dean conceded there had been "some sloppiness" in the mathematics department's handling of the case, "but, as far as I can tell, the final decision was not arrived at disingenuously. It is true that there are some personal conflicts between Professor McGill and at least one other faculty member . . . . [H]owever, I do not see that this had a serious negative influence on the ultimate outcome of the tenure decision."

The appeal then went to an ad hoc appeals evaluation committee, selected by the CAP, and comprised of mathematicians from other University of California campuses. The majority of this committee concluded McGill should not be granted tenure or reappointed at any level. The committee concluded McGill worked on hard problems and did good quality work, but had achieved no fundamental breakthroughs. His work "is not on the forefront of probability issues in this country nor is he pioneering new fields, which he should be doing at his level of experience." While his teaching and service to the University were adequate, he did not meet the high standards required for a tenured position. One committee member wrote a minority opinion that McGill should be granted tenure. The CAP supported the minority position.

The vice-chancellor again recommended McGill be nonreappointed. The chancellor concurred and in June 1992 advised McGill he was nonreappointed.

*The Writ Proceeding*

McGill filed this writ proceeding as well as a complaint for damages for fraud, violation of due process, and age discrimination.[2] In addition to the administrative record, the trial court admitted several affidavits. McGill submitted an affidavit from a University of California, Irvine, English professor regarding qualifications and criteria for tenure. He stated collegiality is not a consideration for tenure. He opined that because of

---

[2]McGill's complaint for damages was severed from the writ, pending resolution of the writ.

McGill's extensive academic experience, he came to the University with "de facto" tenure. A University of California, Berkeley mathematics professor stated McGill should have been granted tenure when originally hired, and was entitled to it now.

The University submitted declarations from mathematics professors at other University of California campuses stating McGill was not qualified for tenure. It also submitted the declaration of its assistant vice-president for academic personnel who stated the evaluation criteria for tenure are: teaching, research and other creative work, professional activity, and University and public service. She also stated, "Collegiality, the ability to get along with one's colleagues, is an appropriate consideration in evaluating a candidate."[3]

McGill submitted his own affidavit detailing the genesis of the animosity of Professors Carmona and Stern towards him. Both submitted their own affidavits denying any personal bias.

The trial court granted a writ of mandate directing the University to set aside its decision to deny tenure and nonreappointment of McGill. It ordered the University to reinstate McGill at the assistant professor, step VI, level for two years and to reconsider him for tenure during the 1994-1995 academic year. Tenure, if granted, was to be effective July 1, 1995. In granting the writ, the trial court concluded the chancellor simply "rubber stamped what the [mathematics] department did" and the mathematics department based its decision "on the fact that Mr. McGill lacked the requisite congeniality. Sounds like the Miss America contest here. The standards for determining tenure are not the same as determining an award for an also ran in a beauty contest. [¶] The proper criteria which are set forth are teaching, university service, professional activities, research. And under all of those it is clear that there is substantial evidence here supporting [McGill's] possible tenure . . . ."

---

[3]Tenure review committees are instructed to consider the American Association of University Professors' Statement on Professional Ethics which provides, in part: "As a colleague, the professor has obligations that derive from common membership in the community of scholars; respects and defends the free inquiry of associates; in the exchange of criticism and ideas, shows due respect for the opinions of others; acknowledges academic debts and strives to be objective in professional judgment of colleagues; and accepts a share of faculty responsibilities for the governance of the institution."

I

The first issue which must be addressed is whether the University's decision to deny tenure to McGill and its failure to reappoint him is subject to review by mandamus (ordinary or administrative), and if so, what standard of review applies. The trial court granted relief in administrative mandamus.

■ Judicial review of most public agency decisions is obtained by a proceeding for a writ of ordinary or administrative mandate. (Code Civ. Proc., §§ 1085, 1094.5.) The applicable type of mandate is determined by the nature of the administrative action or decision. (*Tielsch* v. *City of Anaheim* (1984) 160 Cal.App.3d 570, 574 [206 Cal.Rptr. 738].) Usually, quasi-legislative acts are reviewed by ordinary mandate and quasi-judicial acts are reviewed by administrative mandate. (*Western States Petroleum Assn.* v. *Superior Court* (1995) 9 Cal.4th 559, 566-567 [38 Cal.Rptr.2d 139, 888 P.2d 1268].)

"Generally speaking, a legislative action is the formulation of a rule to be applied to all future cases, while an adjudicatory act involves the actual application of such a rule to a specific set of existing facts." (*Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 35, fn. 2 [112 Cal.Rptr. 805, 520 P.2d 29].) ■ Denial of tenure has the characteristics of an adjudicatory act, which suggests administrative mandate would be an appropriate review mechanism. But administrative mandate is available "only if the decision[] resulted from a 'proceeding in which by law: 1) *a hearing is required to be given*, 2) evidence is required to be taken, and 3) discretion in the determination of facts is vested in the agency.'" (*Weary* v. *Civil Service Com.* (1983) 140 Cal.App.3d 189, 195 [189 Cal.Rptr. 442]; *Mahdavi* v. *Fair Employment Practice Com.* (1977) 67 Cal.App.3d 326, 333 [136 Cal.Rptr. 421].) "[O]rdinary mandate is used to review adjudicatory actions or decisions when the agency was not required to hold an evidentiary hearing." (*Bunnett* v. *Regents of University of California* (1995) 35 Cal.App.4th 843, 848 [41 Cal.Rptr.2d 567].)

Here, there was no legal requirement that the tenure decision result from an evidentiary hearing. McGill was reviewed, in accordance with the University's tenure rules, by a variety of committees. But as an untenured professor, McGill had no due process rights to a full adversarial hearing on denial of tenure. (*King* v. *Regents of University of California* (1982) 138 Cal.App.3d 812, 815 [189 Cal.Rptr. 189]; *Chang* v. *Regents of University of*

*California* (1982) 135 Cal.App.3d 88, 90-91 [185 Cal.Rptr. 167]; cf. *Apte* v. *Regents of University of California* (1988) 198 Cal.App.3d 1084 [244 Cal.Rptr. 312].) Thus, the University's decision is reviewed by ordinary, not administrative, mandate.

Having determined that ordinary mandamus is the appropriate mechanism for judicial review of the University's decision, we turn to the standard of review. ■ "There are subtle differences in the scopes of judicial review for ordinary and administrative mandate. In general, when review is sought by means of ordinary mandate the inquiry is limited to whether the decision was arbitrary, capricious, or entirely lacking in evidentiary support; when review is sought by means of administrative mandate the inquiry is directed to whether substantial evidence supports the decision." (*Bunnett* v. *Regents of University of California, supra*, 35 Cal.App.4th at p. 849, citing *Shapell Industries, Inc.* v. *Governing Board* (1991) 1 Cal.App.4th 218, 230-231 [1 Cal.Rptr.2d 818].)

The trial court applied the administrative mandamus "substantial evidence" test.[4] But we review the matter without reference to the trial court's actions. In mandamus actions, the trial court and appellate court perform the same function. (*Shapell Industries, Inc.* v. *Governing Board, supra*, 1 Cal.App.4th at p. 233.)

■ "In ordinary mandamus proceedings courts exercise very limited review 'out of deference to the separation of powers between the Legislature and the judiciary, to the legislative delegation of administrative authority to the agency, and to the presumed expertise of the agency within its scope of authority.'" (*Shapell Industries, Inc.* v. *Governing Board, supra*, 1 Cal.App.4th at p. 230, quoting *California Hotel & Motel Assn.* v. *Industrial Welfare Com.* (1979) 25 Cal.3d 200, 212 [157 Cal.Rptr. 840, 599 P.2d 31].) The court may not reweigh the evidence or substitute its judgment for that of the agency. (1 Cal.App.4th at p. 230.) The appropriate standard was articulated by the Supreme Court in *California Hotel & Motel Assn.* v. *Industrial Welfare Com., supra*, 25 Cal.3d 200. "A court will uphold the agency action unless the action is arbitrary, capricious, or lacking in evidentiary support. A court must ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute." (*Id.* at p. 212, fn. omitted.)

---

[4]We note, however, the trial court misapplied this standard. It granted the writ because there was substantial evidence in the record to support granting McGill tenure. The trial court should have considered only whether there was substantial evidence to support the University's decision to deny tenure.

## II

■ We turn to the University's decision to deny tenure to McGill and nonreappoint him and conclude the trial court erred in issuing the writ of mandate. The University's decision was not arbitrary or capricious, nor is it unsupported by the evidence in the record.

The University followed its own procedures for evaluating a tenure candidate. Those procedures have routinely been upheld as fair. (See *King* v. *Regents of University of California, supra,* 138 Cal.App.3d 812, 818; *Chang* v. *Regents of University of California, supra,* 135 Cal.App.3d 88.) Although early on in the review there was misinformation in McGill's file regarding publication dates, these irregularities caused the University to grant his appeal from the chancellor's first adverse decision. The record was corrected and reevaluated. The decision was the same.

The University's academic personnel manual sets out the criteria to be considered in evaluating a candidate for tenure. They include teaching, research and other creative work, professional activity, and University and public service. The manual provides, "Superior intellectual attainment, as evidenced both in teaching and in research or other creative achievement, is an indispensable qualification for appointment or promotion to tenure positions." Although the factors are stated objectively, the decision necessarily involves highly subjective components.

McGill insists the denial of tenure was based solely on his lack of "collegiality" which is not one of the listed criteria. The trial court concluded the denial was based on McGill's lack of "congeniality." Although not expressly listed as one of the tenure criteria, it is inescapable that collegiality is an appropriate consideration. The American Association of University Professors' Statement on Professional Ethics contemplates as much. (See *ante,* fn. 3.) Or as noted by one court, "[a]n essential element of the probationary process is periodic assessment of the teacher's performance, including the person's ability and willingness to work effectively with his [or her] colleagues." (*Mabey* v. *Reagan* (9th Cir. 1976) 537 F.2d 1036, 1044; see also *Mayberry* v. *Dees* (4th Cir. 1981) 663 F.2d 502, 514 [the primary factors to be considered in granting tenure include scholarship, pedagogy, service to the university, and collegiality]; Swedlow, *Suing for Tenure: Legal and Institutional Barrier* (1994) 13 Rev. Litig. 557, 563-564 ["In all [tenure review] cases, there are objective and subjective components to the process. The candidate may be required to publish a certain number of articles; this is the objective component. But the subjective component, which may include

quality of writing, the article's subject matter, how the writing is received both popularly and academically, and the prestige of the journal in which the article is published, is also of vital importance in the tenure review. In addition, the subjective component often contains an analysis of the candidate's personality. [¶] The subjective component creates the difficulty of judicial review in academic suits."].)

Furthermore, the record reveals collegiality was but one consideration in denying tenure. Indisputably, there was disagreement on McGill's qualifications. Outside evaluators almost uniformly pronounced his research significant and recommended he be tenured. But within the mathematics department, he was not so highly regarded. An overwhelming majority of the tenured faculty members voted against tenure because they believed his work lacked the significance required for tenure. Furthermore, his University colleagues believed the outside reviewers were considering McGill's work *before* he began teaching at the University, not his work while at the University. The mathematics department colleagues found McGill's teaching to be only adequate, and he had performed little service for the University or the public. The department's views were shared by the dean, the vice-chancellor, and the chancellor. When the matter went through the University's appeal process, the majority view of the ad hoc appeals evaluation committee, which included mathematicians from other University of California campuses, was that McGill's research was not on the forefront and he had achieved no fundamental breakthroughs.

Deficient scholarship is a legitimate reason for denying tenure. (*Lynn* v. *Regents of the University of California* (9th Cir. 1981) 656 F.2d 1337, 1344].) And obviously, evaluating the quality of McGill's scholarship is a subjective process. But it is far beyond the expertise of this, or any, court to evaluate the significance of McGill's research or writings in the area of probability theory or to judge the efficacy of his teaching. (See *Zahorik* v. *Cornell University* (2d Cir. 1984) 729 F.2d 85, 93] ["Courts, moreover, are understandably reluctant to review the merits of a tenure decision. [Citation.] Where the tenure file contains the conflicting views of specialized scholars, triers of fact cannot hope to master the academic field sufficiently to review the merits of such views and resolve the differences of scholarly opinion. Moreover, the level of achievement required for tenure will vary between universities and between departments within universities. Determination of the required level in a particular case is not a task for which judicial tribunals seem aptly suited. Finally, statements of peer judgments as to departmental needs, collegial relationships and individual merit may not be disregarded absent evidence that they are a facade for discrimination."]; see

also *Laborde* v. *Regents of University of California* (C.D.Cal. 1980) 495 F.Supp. 1067, 1070; *Faro* v. *New York University* (2d Cir. 1974) 502 F.2d 1229, 1231-1232.) The University may even have shown poor judgment in not granting McGill tenure. But nothing in the record suggests its decision was made for illegal or improper reasons. We cannot interfere with it.

The judgment is reversed.

Crosby, Acting P. J., and Sonenshine, J., concurred.