[No. A115094. First Dist., Div. Two. May 21, 2008.]

DONNA KATOSH, Plaintiff and Appellant, v.
SONOMA COUNTY EMPLOYEES' RETIREMENT ASSOCIATION et al.,
Defendants and Respondents.

Counsel

John Frederick Shields, Jr., for Plaintiff and Appellant.

Steven Michael Woodside, County Counsel, and Phyllis Crockett Gallagher, Deputy County Counsel, for Defendants and Respondents.

## Opinion

### KLINE, P. J.—

## INTRODUCTION

In this case we address the meaning of the term "regular compensation" in the section of the County Employees Retirement Law of 1937 (CERL) as codified in 1947 (Gov. Code, § 31450 et seq.) that establishes the effective date of a disability retirement (Gov. Code, § 31724, hereafter section 31724).

Donna Katosh appeals from the judgment of the Sonoma County Superior Court denying her petition for writ of mandate (Code Civ. Proc., §§ 1085, 1094.5) by which she sought to compel respondents Sonoma County Employees' Retirement Association (SCERA) and Sonoma County Employees' Board of Retirement (Board) to designate the day following her last day of work, June 27, 2000, as her effective retirement date and to overturn a decision of the Board determining the effective date of her retirement to be October 28, 2004, the day after she exhausted her accrued sick leave. The court determined that appellant had failed to show that the Board erred in setting her retirement date because she did not exhaust her accrued sick leave until October 28, 2004, and that pursuant to section 31724, her retirement could not be effective until she did so.

Appellant contends that the Board and the court erred in construing the term "regular compensation" in section 31724 to include sick leave. We shall affirm the judgment.

## BACKGROUND

The basic facts are not in dispute. Appellant worked for the Sonoma County Human Services Department as a youth supervisor. She was hired in 1989, and stopped working on June 26, 2000. On March 28, 2001, her county

health insurance lapsed.[1] On February 6, 2002, appellant filed an application for a service-connected disability retirement with SCERA. While her application was pending and for reasons not explained in the record before us, she returned to "in pay status" with the county for the two-week period ending December 9, 2002. She did not actually provide services for the county during that period, but received a payment of approximately 40 hours of sick leave previously accrued while she was working.

On July 17, 2003, respondents made a preliminary determination that appellant was not permanently incapacitated. Appellant appealed, arguing she was permanently incapacitated and that the 16-month delay in filing her disability retirement application was due to the inability to ascertain the permanency of her incapacity pursuant to section 31724. Following a hearing before an administrative law judge (ALJ), the ALJ recommended granting appellant's application for a service-related disability retirement. The ALJ did not address the effective retirement date. On October 7, 2004, appellant requested respondents to set the effective retirement date as the last date she received "regular compensation" pursuant to the provision of section 31724 that deems the disability retirement application to have been filed on the "date following the day for which the member last received regular compensation" where "filing of the member's application was delayed . . . by inability to ascertain the permanency of the member's incapacity . . . ." (§ 31724.)

In an October 19, 2004 letter to appellant's attorney, SCERA responded to appellant's request, explaining that appellant's health insurance had lapsed on March 28, 2001, and that "[i]n order for her to be eligible to receive health benefits she must have active health insurance at the time she retires, i.e., her retirement date." Appellant was in "pay status" for the pay period ending December 9, 2002, the date upon which she last received regular compensation, but did not have active health insurance at that time. The letter stated that the county would allow her to return to "in pay status" effective October 12, 2004, "and allow her to run out her sick leave and vacation to give her the 40 hours needed to reinstate her Health Insurance prior to the Board making a decision." The letter advised that to do so she must "contact her department immediately" and request this be done. The letter also advised that "this would mean that her retirement date will be in October of 2004 and she would not receive any retroactive retirement benefits if she is granted a disability retirement. But it would increase her highest final monthly compensation calculation, as well as, give her health insurance benefits as a retiree."

[1] According to respondents, Sonoma County offers its employees health insurance benefits upon retirement only if they have active county health insurance at the time of their retirement.

Appellant's counsel notified SCERA that because health insurance benefits were critical to appellant, she believed she had no choice other than to follow that advice. However, she was neither withdrawing nor waiving her earlier written request that "any disability retirement allowance which is granted be made effective on the date following the day for which she last received regular compensation because of the inability to ascertain the permanency of her incapacity until after that date."

Appellant returned to the county's payroll for a period beginning sometime around October 12, 2004, and ending on October 27, 2004. She used a combination of sick leave and vacation time to achieve the necessary 40 hours to reactivate her health insurance.[2]

On October 21, 2004, the Board adopted the hearing officer's decision and granted appellant a service-connected disability retirement. However, it postponed a decision on the effective date of her retirement (presumably to allow appellant to "run out" her sick leave to reinstate her health benefits). At its meeting of November 18, 2004, the Board "confirmed its decision that sick leave is regular compensation" and set appellant's retirement date as "the day after [her] last day on payroll, October 28, 2004."

On January 13, 2005, appellant filed a timely petition for a writ of mandate in the superior court. She argued that the Board abused its discretion and acted contrary to law by characterizing the payment of sick leave and vacation compensation as "regular compensation" as the term is used in section 31724.

Following a hearing, the trial court denied the petition for writ of mandamus, agreeing with SCERA and with the Board that sick leave is included in regular compensation and concluding that section 31724 requires "that a successful disability retirement applicant exhaust her accrued sick leave before a disability retirement can become effective. . . . Because Petitioner did not exhaust her accrued sick leave until October 28, 2004, her retirement could not be effective until after that date."[3]

This timely appeal followed.

---

[2] As respondents note, the breakdowns of the hours used in December 2002 and October 2004 are not in the record. Appellant does not dispute that the October 2004 compensation was a combination of paid vacation and sick leave.

[3] Although the parties had briefed the issue of whether appellant met her burden of proving the delay in filing her application was due to an inability to ascertain the permanency of her incapacity, neither SCERA nor the trial court addressed this issue. It was unnecessary to do so given the conclusion that appellant received regular compensation in December 2002.

## DISCUSSION

*Standards of review*

The parties agree that the question raised here is the interpretation and application of section 31724 to the facts. We agree the question whether "regular compensation" in section 31724 includes sick leave is a question of statutory construction. Therefore, our review of the trial court's ruling is de novo. (*In re Retirement Cases* (2003) 110 Cal.App.4th 426 [1 Cal.Rptr.3d 790].) We apply our independent judgment to the trial court's determination of questions of law. (*Santa Clara Valley Transportation Authority v. Rea* (2006) 140 Cal.App.4th 1303, 1313 [45 Cal.Rptr.3d 511]; *MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1082 [36 Cal.Rptr.3d 650].)[4]

Settled rules of statutory construction guide our review: " ' "Statutes are to be interpreted in accordance with their apparent purpose . . . ." (*Kaiser Foundation Health Plan, Inc. v. Lifeguard, Inc.* (1993) 18 Cal.App.4th 1753, 1762 [23 Cal.Rptr.2d 235].) First and foremost, we look for that purpose in the actual language of the statute. (*Mercer v. Department of Motor Vehicles* (1991) 53 Cal.3d 753, 763 [280 Cal.Rptr. 745, 809 P.2d 404].) If the meaning is without ambiguity, doubt, or uncertainty, then the language controls. (*Security Pacific National Bank v. Wozab* (1990) 51 Cal.3d 991, 998 [275 Cal.Rptr. 201, 800 P.2d 557].) If the meaning of the words is not clear, we may refer to various extrinsic aids, including the history of the statute, to

---

[4] Appellant argues the proceeding was one for ordinary mandamus under Code of Civil Procedure section 1085. Respondents characterize it as one for administrative mandamus under Code of Civil Procedure section 1094.5. For purposes of our review it matters little. " 'Judicial review of most public agency decisions is obtained by a proceeding for a writ of ordinary or administrative mandate. (Code Civ. Proc., §§ 1085, 1094.5.) The applicable type of mandate is determined by the nature of the administrative action or decision. [Citation.] Usually, quasi-legislative acts are reviewed by ordinary mandate and quasi-judicial acts are reviewed by administrative mandate.' (*McGill v. Regents of University of California* (1996) 44 Cal.App.4th 1776, 1785 [52 Cal.Rptr.2d 466].) There are subtle differences between the scope of judicial review applied to ordinary mandamus and that used for administrative mandamus. (*Bunnett v. Regents of University of California* (1995) 35 Cal.App.4th 843, 849 [41 Cal.Rptr.2d 567].) Regardless of the writ involved, however, where the facts are undisputed, the reviewing court faces a question of law. 'On questions of law arising in mandate proceedings, we exercise independent judgment.' (*Ibid.*) In those circumstances, the trial and appellate courts perform the same function. (*Shapell Industries, Inc. v. Governing Board* (1991) 1 Cal.App.4th 218, 233 [1 Cal.Rptr.2d 818].) Accordingly, to decide the meaning of [the statute], we apply our independent review without reference to the trial court's actions. (*McGill v. Regents of University of California, supra*, 44 Cal.App.4th at p. 1786.)" (*Santa Clara Valley Transportation Authority v. Rea, supra*, 140 Cal.App.4th at p. 1313.)

determine the intent of the Legislature. (*Kaiser Foundation Health Plan, Inc. v. Lifeguard, Inc., supra,* 18 Cal.App.4th at p. 1762.)' " (*Santa Clara Valley Transportation Authority v. Rea, supra,* 140 Cal.App.4th at pp. 1313–1314; see *MacIsaac v. Waste Management Collection & Recycling, Inc., supra,* 134 Cal.App.4th at pp. 1082–1083.)

■ "Any ambiguity or uncertainty in the meaning of pension legislation must be resolved in favor of the pensioner, but such construction must be consistent with the clear language and purpose of the statute. [Citations.]" (*Ventura County Deputy Sheriffs' Assn. v. Board of Retirement* (1997) 16 Cal.4th 483, 490 [66 Cal.Rptr.2d 304, 940 P.2d 891] (*Ventura*); accord, *In re Retirement Cases, supra,* 110 Cal.App.4th at p. 439.) " '[I]f neither the words of the statute nor its legislative history reveal[s] a clear meaning, we apply reason and practicality, and interpret the statute in accord with common sense and justice, and to avoid an absurd result. [Citation.]' (*In re Marriage of Campbell* (2006) 136 Cal.App.4th 502, 506 [38 Cal.Rptr.3d 908].)" (*Santa Clara Valley Transportation Authority v. Rea, supra,* 140 Cal.App.4th at p. 1314; see *MacIsaac v. Waste Management Collection & Recycling, Inc., supra,* 134 Cal.App.4th at p. 1084.)

"Although our review is independent, we do not necessarily disregard the [agency's] interpretation of the law. 'Where the meaning and legal effect of a statute is the issue, an agency's interpretation is one among several tools available to the court. Depending on the context, it may be helpful, enlightening, even convincing. It may sometimes be of little worth. [Citation.] Considered alone and apart from the context and circumstances that produce them, agency interpretations are not binding or necessarily even authoritative. . . .' (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7–8 [78 Cal.Rptr.2d 1, 960 P.2d 1031].) It follows that if application of the settled rules of statutory interpretation does not clearly reveal the Legislature's intent, the [agency's] interpretation of the statutes in the context of this case may be helpful." (*Santa Clara Valley Transportation Authority v. Rea, supra,* 140 Cal.App.4th at p. 1314.)

*Section 31724*

Section 31724 provides in its entirety: "If the proof received, including any medical examination, shows to the satisfaction of the board that the member is permanently incapacitated physically or mentally for the performance of his duties in the service, it shall retire him effective on the expiration date of

any leave of absence with compensation to which he shall become entitled under the provisions of Division 4 (commencing with Section 3201) of the Labor Code or effective on the occasion of the member's consent to retirement prior to the expiration of such leave of absence with compensation.[5] *His disability retirement allowance shall be effective as of the date such application is filed with the board, **but not earlier than the day following the last day for which he received regular compensation**. Notwithstanding any other provision of this article, the retirement of a member who has been granted or is entitled to sick leave shall not become effective until the expiration of such sick leave with compensation unless the member consents to his retirement at an earlier date.*

"When it has been demonstrated to the satisfaction of the board that the filing of the member's application was delayed by administrative oversight or by inability to ascertain the permanency of the member's incapacity until after the date following the day for which the member last received regular compensation, such date will be deemed to be the date the application was filed." (§ 31724, italics & boldface added.)

Appellant contends that "regular compensation" as used in the statute does not include sick leave or vacation pay and that her last day of receiving "regular compensation" was her last day of actual work, June 26, 2000. She argues that because her delay in filing her application was due to an inability to ascertain the permanency of her incapacity, her effective retirement date should be the date following her last day of actual work as so defined. However, it is conceded that neither the Board nor the court addressed appellant's claim that she came within the second paragraph of the statute because the filing of her application was delayed by the inability to ascertain the permanency of her incapacity. It was unnecessary to do so, given the determination that "regular compensation" includes sick leave and vacation and therefore, that the last day for which she received "regular compensation" was October 27, 2004. Consequently, the issue of inability to ascertain permanency does not come into play unless we determine that appellant has established that "regular compensation" does not include sick leave or vacation. If such were the case, remand for determination of the factual issue of whether appellant carried her burden of demonstrating the delay was caused by an inability to determine permanency would be required. We address only the issue of whether sick leave and vacation are included in the term "regular compensation" in this statute.

---

[5] Division 4 of the Labor Code relates to workers' compensation and is not involved in this case.

*Plain meaning*

Respondents contend that the "plain meaning" of the term "regular compensation" includes wages and salary paid for sick leave and vacation. Appellant argues, to the contrary, that the language of the statute and its legislative history indicate that sick leave is not included in regular compensation.

"The term 'regular compensation' is not defined, either statutorily or judicially." (*Puckett v. Orange County Bd. of Retirement* (1988) 201 Cal.App.3d 1075, 1078 [247 Cal.Rptr. 672] (*Puckett*).) After *Puckett*, both the California Supreme Court and this court have addressed issues that assist in determining the question here. (See *Ventura, supra,* 16 Cal.4th at pp. 497–498; *In re Retirement Cases, supra,* 110 Cal.App.4th at pp. 438–441, 472–476.) Nevertheless, we cannot say that the "plain meaning" of the statute either includes or excludes sick leave from the term "regular compensation." We begin with the words of the statute.

Webster's Third New International Dictionary (2002) defines the term "regular" as: "**3 a**: steady or uniform in course, practice, or occurrence: not subject to unexplained or irrational variation: steadily pursued: ORDERLY, METHODICAL <~ habits> **b** (1): returning, recurring, or received at stated, fixed, or uniform intervals <a ~ income> <in the ~ course of events> . . . ." (*Id.* at p. 1913.)

We are not persuaded that the use of the term "regular" to modify "compensation" suggests that the term should be equated with "actually working," as appellant contends. Both sick leave and vacation are accrued on a regular basis and, when taken as time off, the employee receives *"regular salary or wages without the necessity of performing services."* (*Ventura, supra,* 16 Cal.4th at p. 497, italics added.) "Compensation" is defined in Government Code section 31460 "as 'the remuneration paid in cash out of county or district funds, plus any amount deducted from a member's wages for participation in a deferred compensation plan . . . but does not include the monetary value of board, lodging, fuel, laundry, or other advantages furnished to a member.' " (*Ventura,* at pp. 490–491.) "Regular compensation" would necessarily be a subset of the broader term "compensation."[6]

---

[6] The Supreme Judicial Court of Massachusetts has addressed the meaning of "regular compensation," stating: " 'The expression seems to us to point to recurrent or repeated amounts of compensation not inflated by extraordinary ad hoc payments.' [Citation.] Regular compensation 'refers to remuneration geared to work or services performed; moreover "regular," as it modifies "compensation," imports the idea of ordinariness or normality as well as the idea of recurrence.' [Citation.]" (*Hallett v. Contributory Retirement Appeal Board* (2000) 431 Mass. 66, 70 [725 N.E.2d 222, 225], quoting *Boston Ass'n of School Adm'rs & Supervisors v. Boston Retirement Board* (1981) 383 Mass. 336, 341 [419 N.E.2d 277].)

Appellant acknowledges that the first sentence of section 31724 refers to certain temporary disability benefits under the workers' compensation law that are not at issue here. That sentence makes a disability retirement effective "on the expiration date of any leave of absence with compensation" under Division 4 of the Labor Code, or effective "on the occasion of the member's consent to retirement prior to the expiration of such leave of absence with compensation." (§ 31724.)

The second sentence in section 31724 provides that a "disability retirement allowance shall be effective as of the date such application is filed with the board, but not earlier than the day following the last day for which he received regular compensation." It is the term "regular compensation" as used here that is at issue.

The third sentence of section 31724 provides: "Notwithstanding any other provision of this article, the retirement of a member who has been granted or is entitled to sick leave shall not become effective until the expiration of such sick leave with compensation unless the member consents to his retirement at an earlier date." Appellant argues that this sentence "expressly distinguishes" "sick leave" from "regular compensation" as used in the second sentence and that there would be no reason for the Legislature to include this third sentence if "sick leave" were "regular compensation." We disagree.

█ The reference to "regular compensation" in the second sentence sets the retirement allowance date as the later of the date of application or the day following the last day the employee receives "regular compensation." This provision ensures against retirees "double-dipping" (receiving "regular compensation" at the same time they receive retirement benefits), protects the taxpayer's funds, and simplifies administration by providing a clear command to the retirement system. (See *Puckett, supra,* 201 Cal.App.3d at pp. 1079–1080.) The third sentence regarding exhaustion of sick leave protects the disabled employee from being retired before having an opportunity to receive wages for accrued sick leave. It ensures that a member who is granted a disability retirement, but has not yet exhausted his or her sick leave, is provided the option of delaying the effective date of retirement so that the member can obtain the advantages of the sick leave benefits to which he or she is entitled. Advantages of doing so include: the employee continues to receive service credit during the period of sick leave; while the disability retirement benefit is only a percentage of the employee's salary, during sick leave the employee receives full wages; and a retirement allowance is calculated at a higher rate if the employee's salary is increased during the period of sick leave. Moreover, as in this case, the option of reinstating lapsed county health insurance is available during the sick leave period, so the employee may retain the insurance as a retiree.

*Legislative history*

The legislative history of this provision confirms that, in amending the statute to add the third sentence, the Legislature intended to "allow a member to use all accumulated sick leave prior to disability retirement." (Assem. Com. on Retirement, Analysis of Assem. Bill No. 1960 (1972 Reg. Sess.) July 4, 1972; see Historical Note, 35 West's Ann. Gov. Code (1988 ed.) foll. § 31724, p. 328.) As the bill analysis of the Assembly Committee on Retirement states: "Under present 1937 County Act Law, the practice of permitting members to use accrued sick leave prior to disability retirement varies from county to county. AB 1960 would provide that a member could not be retired for disability until after the expiration of his accrued sick leave, without the member's consent." (*Ibid.*) The analysis continues: "Sick leave benefits vary greatly from county to county. Some counties provide cash payments for accrued sick leave upon separation or upon retirement, while other counties have quite modest sick leave programs. [¶] . . . AB 1960 would not affect the type of sick leave program offered by a county, but would provide that an employee is entitled to any benefits accrued at the time of retirement for disability." (*Ibid.*)

Appellant contends the Board and the trial court erred in finding that section 31724 "requires" a disabled employee to "exhaust" accrued sick leave before a disability retirement can become effective. In its statement of decision, the court stated: "The statute requires that a successful disability retirement applicant exhaust her accrued sick leave before a disability retirement can become effective. . . . Because [appellant] did not exhaust her accrued sick leave until October 28, 2004, her retirement could not be effective until after that date." As a general statement of the law that a member is *required* to exhaust sick leave before a disability retirement can become effective, the statement is patently erroneous. It would read out of the third sentence, the phrase "unless the member consents to his retirement at an earlier date." (§ 31724.)

■ This provision of section 31724 permits a disability retirement to become effective at the employee's option, *before* exhaustion of accrued leave in counties, such as Sonoma, that allow employees separated from county service by retirement for disability to opt for "payment at such employee's base hourly rate for *all unused sick leave* remaining to such employee's credit as of the time of separation . . . ." (Mem. of Understanding between the county and the Sonoma County Law Enforcement Association (MOU), § 22.6, italics added.) *In re Retirement Cases, supra,* 110 Cal.App.4th 426, 473, describes such payment of accrued but unused sick leave and

vacation as "termination pay." As we have discussed, the legislative history of section 31724 recognizes that some counties provide cash payments for accrued sick leave upon separation or retirement, while others do not. The amendment of section 31724 was not intended to interfere with those practices, but to require that *all* counties allow the disability retiree to use accumulated sick leave prior to retirement and to prevent counties from retiring a member for disability before expiration of accrued sick leave, without the member's consent.

Nevertheless, our recognition that the court's statement was erroneous does not resolve the issue presented here as to whether the court and the Board correctly determined that "regular compensation" includes sick leave. In Sonoma County a disabled member covered by the MOU may "consent" to retirement *before* using accumulated sick leave and still recover the lump sum payment of accrued sick leave and vacation upon retirement.[7] However, this does *not* mean that a member can *use* the sick leave and *then* consent to a retirement date before the sick leave was taken. Such "double-dipping" is prohibited. (*Puckett, supra*, 201 Cal.App.3d at pp. 1077, 1080.)

*Case law*

In *Ventura, supra*, 16 Cal.4th 483, the California Supreme Court addressed the question "whether various payments by the county over and above the basic salary paid to all employees in the same job classification are 'compensation' within the meaning of the statute which defines compensation ([Gov. Code,] § 31460), and, if so, whether those payments are also 'compensation earnable' ([Gov. Code,] § 31461) and thus part of a retiring employee's 'final compensation' ([Gov. Code,] § 31462 or 31462.1) for purposes of calculating the amount of a pension." (*Ventura*, at p. 487.) After considering the language and legislative history of the relevant provisions, the court concluded that the "Legislature did not intend to require that a county include its contributions to an employee's deferred compensation plan in 'compensation' as defined in CERL." (*Ibid.*) However, the court also concluded that the other disputed premiums—cash payments, including "pay in lieu of annual leave

---

[7] The MOU provides in pertinent part: "21.6 Payment for Unused Vacation [¶] Each employee who is separated from County service shall be entitled to payment in lieu of all unused vacation leave which the employee may have accumulated as of the employee's last day of work and shall be computed on the basis of such employee's base hourly rate at the time of separation. [¶] . . . [¶]

"22.6 Sick Leave Payoff at Disability Retirement [¶] Each employee separated from County service by retirement for disability or duty-related death shall be entitled to payment at such employee's base hourly rate for all unused sick leave remaining to such employee's credit as of the time of separation or duty-related death."

accrual [and] holiday pay"—were included in final compensation. (*Id.* at pp. 487–488, fns. omitted.) "With the exception of overtime pay, items of 'compensation' paid in cash, even if not earned by all employees in the same grade or class, must be included in the 'compensation earnable' and 'final compensation' on which an employee's pension is based." (*Id.* at p. 487.)

In reaching its determination, the Supreme Court relied upon the statutory definitions of "compensation" (Gov. Code, § 31460) and "compensation earnable" (Gov. Code, § 31461). (*Ventura, supra,* 16 Cal.4th at pp. 490–491.)[8]

The *Ventura* court's discussion of "annual leave" compensation is relevant here. The Supreme Court agreed with the Court of Appeal that a "longevity bonus and cashed-out accrued vacation are remuneration under [Government Code] section 31460 and, since neither is an excluded 'advantage,' [under the statute] both are 'compensation.' " (*Ventura, supra,* 16 Cal.4th at p. 497.)

"Plaintiffs concede that when annual leave is received as time off, it does not meet the statutory definitions of 'compensation' or 'compensation earnable.' *When annual leave is taken as time off, the employee simply continues to receive* **regular** *salary or wages without the necessity of performing services. Receipt of that pay is part of the employee's 'remuneration' for past services and is 'compensation.' When an employee elects to receive cash in lieu of accrued vacation and the wages or salary the employee would receive during the vacation period, the cash, like the vacation pay the employee would otherwise receive, is part of the employee's 'remuneration' for past services.* The same analysis applies to the county's 'longevity incentive' since that item simply grants additional vacation hours to be accrued or cashed out to those employees with five years or more service who are covered by the resolution. Payment to longtime employees, whether in salary for vacation days on which no work is performed or in additional cash, is equivalent to increased pay that often accompanies seniority. It, too, is 'remuneration' and 'compensation.' " (*Ventura, supra,* 16 Cal.4th at pp. 497–498, italics & boldface added, fn. omitted.)

Although the Supreme Court was not analyzing the term "regular compensation" as used in section 31724, its analysis of the character of annual leave

---

[8] "Compensation earnable" is defined in Government Code section 31461 as "the average compensation as determined by the board, for the period under consideration upon the basis of the average number of days ordinarily worked by persons in the same grade or class of positions during the period, and at the same rate of pay. The computation for any absence shall be based on the compensation of the position held by the member at the beginning of the absence."

(i.e., leave offered participating employees in lieu of sick leave and vacation) taken by the employee before retirement, provides strong support for an interpretation of "regular compensation" as including annual leave, sick leave and vacation when taken as time off during the period of employment. As recognized by the Supreme Court, when annual leave is taken as time off, the employee "continues to receive *regular salary or wages* without the necessity of performing services. Receipt of that pay is part of the employee's 'remuneration' for past services and is 'compensation.' " (*Ventura, supra,* 16 Cal.4th at p. 497, italics added.)

In *In re Retirement Cases, supra,* 110 Cal.App.4th 426, this court determined the holding of *Ventura, supra,* 16 Cal.4th 483, could be applied retroactively. (*In re Retirement Cases,* at pp. 434–435, 468.) We also held, among other things, that certain items of remuneration that did *not* involve cash payments to an employee *before* his or her retirement should not be included in calculations of final compensation. Included in this category were "cash-outs by employees of unused leave upon separation from service (termination pay)." (*Id.* at pp. 472, 473–476.) The plan members argued that termination pay should be included in the final calculation of their benefits. "By termination pay, they are referring to the one-time cash payments made to plan members upon retirement for accrued but unused compensatory time, sick leave time, and vacation or holiday time." (*Id.* at p. 473.) We rejected the members' argument that there was "no significant difference between annual in-service cash payments, which *Ventura* held to be included in pension computations, and termination payments." (*Ibid.*) We agreed with the trial court that: " 'Where an employee cannot or does not elect to receive cash in lieu of the accrued time off prior to retirement, the benefit remains one of time rather than cash.' The right to a termination pay cash-out arises only upon retirement ([Gov. Code,] § 19839), that is *separated* from service; the right does not arise prior to retirement or during service." (*In re Retirement Cases,* at p. 475, fn. omitted.)

Respondents also point to the discussion of vacation pay in *Suastez v. Plastic Dress-Up Co.* (1982) 31 Cal.3d 774 [183 Cal.Rptr. 846, 647 P.2d 122], in which the Supreme Court recognized: "[V]acation pay is not a gratuity or a gift, but is, in effect, additional wages for services performed." (*Id.* at p. 779.)

■ It thus appears that the meaning of the term "regular compensation," in the context of the analyses of *Ventura* and *In re Retirement Cases,* would include the "regular salary or wages" (*Ventura, supra,* 16 Cal.4th at p. 497)

that the employee receives when taking sick leave or vacation during the period of employment.[9] However, "termination pay" consisting of "one-time cash payments made to plan members upon retirement for accrued but unused compensatory time, sick leave time, and vacation or holiday time" (*In re Retirement Cases, supra*, 110 Cal.App.4th at p. 473) would not constitute "regular compensation."

*Appellant used her sick leave and vacation*

In this regard, it becomes important to determine the character of the payments made to appellant in December 2002, and again in October 2004. The parties' views of what happened on those two occasions differ markedly.

Respondents contend that on those two occasions, appellant was "on the payroll" as an employee and was using her accrued sick leave in December 2002 and accrued sick leave and vacation time in October 2004. Consequently, respondents contend the pay appellant received on those occasions was regular compensation as recognized in *Ventura, supra*, 16 Cal.4th at page 497 (an employee taking annual leave during employment "simply continues to receive *regular salary or wages* without the necessity of performing services. Receipt of that pay is part of the employee's 'remuneration' for past services and is 'compensation.' " [Italics added.]). Appellant views the money she received on those two occasions as in the nature of the "lump sum" payout provided in sections 21.6 and 22.6 of the MOU governing the terms and conditions of her employment and guaranteeing her the full value of her unused sick leave in a lump sum because of her service-related disability. Respondents' characterization of these payments is consistent with the record here; appellant's is not. Moreover, to the extent the question requires a factual determination, we defer to the trial court and to the Board.

The trial court specifically found that appellant "requested and received the payment of accrued sick leave on or about October 28, 2004 and at that time was placed back in pay status . . . ." Appellant does not dispute that the money she was paid in December 2002 and October 2004 was for sick leave and vacation she accrued before she stopped working in June 2000. Although appellant likens the payments to the "lump sum" payments of accrued sick leave and vacation pay the MOU allows a member retired for disability to take upon retirement, the December 2002 payment was not a complete "lump sum" or cash-out of her sick leave. Had it been so, she would not have been able to use sick leave she had accrued while actually working to return to "in

[9] We need not determine here whether cash back in lieu of annual leave, sick leave or vacation time during the term of employment would also constitute "regular compensation."

pay status" in October 2004 for purposes of reinstating her health insurance. Appellant argues that the distinction between a lump sum termination payment, and being returned to "in pay status" to allow her to use her sick leave, is a "distinction without a difference." We believe this distinction makes a real difference here and that it is important to determine whether appellant received regular pay when she used her sick leave before her retirement or, having retired, was provided "termination pay" pursuant to the MOU. The record supports the trial court's determination that appellant was "in pay status" for the periods during which appellant received the sick leave payments.

Appellant points out that she was returned to the county's payroll on October 12, 2004, but that she did not request to do so until after October 19, 2004. Appellant argues that this was a "flaw" in respondents' argument, but does not assert such retroactive action was improper, nor does she provide any authority that such action was inconsistent with respondents' assertion that appellant received regular pay during this period. Certainly, it does not undermine respondents' assertion that she was "on payroll" when she used sick leave in December 2002.

*Other statutes*

■ In trying to ascertain legislative intent, we may look to similar laws that employ the same language. (*Balasubramanian v. San Diego Community College Dist.* (2000) 80 Cal.App.4th 977, 988 [95 Cal.Rptr.2d 837] ["We must construe identical words in different parts of the same act or in different statutes relating to the same subject matter as having the same meaning. [Citation.]"]; *In re Bittaker* (1997) 55 Cal.App.4th 1004, 1009 [64 Cal.Rptr.2d 679].) Respondents look to the phrase "regular compensation" in other statutes, not part of CERL, to support their argument that one may receive "regular compensation" without actually working.

Respondents point first to Code of Civil Procedure section 215 regarding jury service, and to Government Code section 19991.13 regarding employee leave credit donations. Code of Civil Procedure section 215 provides that a public employee may not be paid juror fees if he or she receives "regular compensation and benefits" from his or her employer while performing jury service. Respondents contend that the employee is not actually working in his or her employment capacity when he or she is performing jury service, yet the employee is receiving "regular compensation" from the public employer. Similarly, Government Code section 19991.13 provides that state employees may donate leave credits to fellow employees who suffer a catastrophic injury. However, the amount of credits "may not exceed an amount sufficient

to ensure the continuance of regular compensation." (Gov. Code, § 19991.13, subd. (e).) The state employee is out on sick leave donated by fellow employees, but is receiving "regular compensation" from the employer. Respondents also refer to California Code of Regulations, title 5, section 42803, subdivision (b)(6), providing that certain state university employees who serve an extra quarter without compensation "shall be entitled to a compensatory quarter off at a later date with regular compensation and benefits applicable at that time." Respondents assert that in these situations the employee is not providing services to the employer, but the compensation the employee is earning is described as "regular compensation."

Appellant counters that jury service is fairly construed as a "regular" duty of a public employee when "regular compensation" is paid while performing that duty and that inclusion of the word "benefits" indicates that sick leave and vacation are included as "benefits" received in addition to the employee's regular compensation during this service. We disagree. While jury service may be a duty of citizens, it is not a "regular" one. Moreover, respondents' point is that the statute describes an employee as receiving "regular compensation" from the employer, although not actually working in his or her employment capacity.

Appellant also argues that use of the phrase "regular compensation" in Government Code section 19991.13 is not inconsistent with appellant's understanding of section 31724, because the phrase refers to the *value* received by public employees and not the compensation they earn while performing regular duties. We fail to see the distinction. Fellow employees donate leave credits to allow the recipient employee to continue to receive regular compensation and the donated sums may not exceed the amount necessary to assure the continuance of that regular compensation.[10]

*Policy considerations*

Appellant and respondents both make policy arguments in support of their differing constructions of the statute.

---

[10] Appellant in turn points to Government Code section 31469.1, subdivision (b), defining "county peace officer" to mean "any inspectors, detectives and investigators employed by the district attorney, whose principal duties are to investigate crime and criminal cases and to receive regular compensation for that service." Appellant argues this definition is consistent with her interpretation of section 31724 because it describes what employees receive for performing their regular duties as "regular compensation." However, nothing in that section is inconsistent with a determination that "regular compensation" includes sick leave and vacation.

Appellant contends the intent of CERL is to allow disabled employees to be replaced "without inflicting a hardship upon the employees removed" (Gov. Code, § 31451),[11] and the purpose of section 31724 is to assure that employees receive payment of disability benefits for the entire period of disability, including the full value of their accrued sick leave. (See *Weber v. Board of Retirement* (1998) 62 Cal.App.4th 1440, 1448–1449, 1452 [73 Cal.Rptr.2d 769].) She reminds us that " 'pension legislation must be liberally construed and applied to the end that the beneficent results of such legislation may be achieved. . . .' [Citations.]" (*Bowen v. Board of Retirement* (1986) 42 Cal.3d 572, 577 [229 Cal.Rptr. 814, 724 P.2d 500]; see *Puckett, supra*, 201 Cal.App.3d at p. 1079.)

Nevertheless, the determination whether sick leave is included as part of "regular compensation" is a question of law. Here it is in appellant's interest to exclude sick leave from the definition of regular compensation. It may be that there are circumstances in which such interpretation is adverse to the interests of the member. The interpretation of the statute should not vary by the particular circumstance of the disability retirement applicant.

Respondents argue that defining "regular compensation" to include sick leave and vacation serves the important policies of avoiding "double-dipping" by the retiree and establishing a bright-line test rather than fostering confusion. They point out that there is a strong public policy against pension payments that "double-dip" into taxpayer funds. (See *City of Los Angeles v. Industrial Acc. Com.* (1965) 63 Cal.2d 242, 253 [46 Cal.Rptr. 97, 404 P.2d 801]; *Puckett, supra*, 201 Cal.App.3d at pp. 1077, 1080.) Moreover, "[t]he rule that pension laws should be liberally construed to carry out their beneficent purposes . . . is not designed to encourage a construction which would cause an employer . . . to become doubly liable for the same disability." (*City etc. of S. F. v. Workmen's Comp. App. Bd. (Engler)* (1968) 267 Cal.App.2d 771, 783 [73 Cal.Rptr. 429], citation omitted.) Respondents argue that the Legislature must have intended wages received for vacation and sick leave to be included in "regular compensation," because "[t]his is the only interpretation that carries out the [L]egislature's intent of avoiding 'double-dipping' without creating confusion and unfairness in the administration of the system." They assert that appellant's interpretation of "regular compensation" as compensation received for "actually working" could result

---

[11] Government Code section 31451 provides: "The purpose of this chapter is to recognize a public obligation to county and district employees who become incapacitated by age or long service in public employment and its accompanying physical disabilities by making provision for retirement compensation and death benefit as additional elements of compensation for future services and to provide a means by which public employees who become incapacitated may be replaced by more capable employees to the betterment of the public service without prejudice and without inflicting a hardship upon the employees removed."

in large employee windfalls, although they acknowledge appellant has received wages for only 80 to 120 hours of service during the period for which she seeks retirement benefits. Under that scenario, an employee could stop working for the county, apply for disability retirement and then run out weeks of vacation time, sick leave, and compensatory time, receiving "regular" wages for many weeks or months. When granted a disability retirement, the employee would be entitled to a retirement allowance from the date of application (or sooner under the last paragraph of § 31724) even though the employee had received large amounts of compensation from the county during the same period.

Respondents further argue that inequity will result if "regular compensation" is limited to compensation received for actually working, because employees who do not attempt to return to work following their disability will be treated more favorably than those who unsuccessfully attempt to return to work. Respondents posit that under appellant's interpretation an employee who unsuccessfully tries to return to work several months after being injured, but who can work only a few days, would be denied retroactive benefits, because he or she received salary or wages for that trial period. In contrast, a person making no attempt to return to work, but using sick leave after several months, would receive benefits retroactive to the last day of actual work. In appellant's case, she would receive a retirement allowance retroactive to June 2000, her last day of actual work (assuming the delay in filing her application is determined to be due to an inability to ascertain permanency). However, if she had actually tried to return to work for two weeks in December 2002, she would not be entitled to a retirement allowance before that date. "A primary purpose of a pension program is to encourage continued public service. [Citation.]" (*Puckett, supra,* 201 Cal.App.3d 1075, 1079.) Adoption of appellant's interpretation of the statute would treat the employee who tried to return to work some time after disability less favorably than the employee who did not make the attempt, but used sick leave for the same time period.

Such a consideration influenced the determination of the court in *Puckett, supra,* 201 Cal.App.3d 1075. There, the court determined that "regular compensation" in section 31724 did not include the disabled member's compensation in another, lower paying position to which he was assigned while waiting for the Board to act upon his disability retirement application from his fire apparatus engineer position. Puckett argued that the term "regular compensation" referred to his compensation at the position from which he was retiring. "His regular compensation was thus discontinued when he retired from his position as a fire apparatus engineer." (201 Cal.App.3d at p. 1078.) The Board had concluded that Puckett could not

receive disability retirement while working in any paid capacity for the county. (*Ibid.*) Consequently, the Board contended that "regular compensation" meant " 'regular, ordinary compensation for services rendered as an employee, as opposed to sick leave or workers' compensation benefits, or similar benefit payments which are made in lieu of salary when an employee is unable to work.' " (*Ibid.*) Therefore, the Board argued Puckett's salary at the lower position was "regular compensation" within the meaning of the statute. The appellate court began "with the precept that pension statutes are to be liberally construed in an applicant's favor 'to effectuate the purpose of providing benefits to an employee and his family. [Citation.]' [Citation.]" (*Id.* at p. 1079.) It therefore resolved the ambiguity in the statute in Puckett's favor, explaining that to do otherwise would penalize him for accepting an alternate county job in order to sustain himself during the period of over a year that his application was pending. The court's resolution of the ambiguity in favor of the employee also recognized the primary purpose of the law as encouraging continued public service and removing a motivation for county employees to terminate their county employment immediately upon filing a disability application. (*Ibid.*) *Puckett* also resolved the problem of "double-dipping" resulting from the trial court's ruling that Puckett was entitled to full disability retirement payments on top of his compensation at the second job. The appellate court held that "Puckett should receive no more than an employee who continues in alternate county employment pursuant to Government Code section 31725.5, i.e. the difference between his compensation at his second county job and the higher salary at his former position." (*Id.* at pp. 1079–1080.)

The *Puckett* court found authority for an offset in Governemnt Code section 31725.5, which allows alternate county employment in lieu of disability retirement, and in such cases allows the county to pay the member the difference in such compensation until the compensation of the new position equals or exceeds the compensation of the former position, but not exceeding the amount which the employee would otherwise be entitled to receive as a disability retirement allowance. Respondents assert that "unlike the situation in *Puckett*, there is no authority in [CERL] for a county retirement system to set an early retirement date and then offset the retirement allowance by an amount equal to any compensation received from the county after that date."

Appellant challenges respondents' policy concerns as "myths." She argues that she had earned the sick leave and vacation she received before she stopped working, and that under the MOU, she was entitled to receive payment of the full value of these items of compensation upon retirement for disability, whether or not her retirement was made retroactive. Consequently, she contends that to the extent she has already received wages for the period of her sick leave (double-dipping) she was entitled to receive virtually the

same payments anyway as a "lump sum" termination payment under the MOU. Appellant points out the legislative history of section 31724 confirms that the purpose of the amendment to that section was to allow members the option of using accrued sick leave before retiring in an attempt to protect employees who, unlike appellant, work in counties that do not make a lump sum payment of accrued sick leave upon retirement. The legislative intent, appellant asserts, was not to prevent "double-dipping," but to assure that employees obtain the full value of their accrued sick leave.

Appellant also challenges respondents' equity argument, asserting that the unfairness is hypothetical and that respondents' interpretation of "regular compensation" to include sick leave and vacation results in denial of retroactive benefits to *both* groups of employees—those who unsuccessfully try to return to work and those who use sick leave. She contends that respondents do not explain how denial of retroactivity to both groups of employees would encourage employees to attempt to return to work. She asserts that under respondents' scenario, the only way a disabled employee obtains retroactivity to the last day of actual work is by not attempting to return to work and not using sick leave.[12]

We agree with respondents that appellant's interpretation builds in an incentive for a disabled employee to retire, rather than to attempt to return to work. Respondents' interpretation does not *discourage* an employee from attempting to return to work.

Respondents' "bright line" policy argument appears less persuasive, as we have not discerned from the statute alone a clear legislative choice to include sick leave and vacation pay in "regular compensation." Rather, the legislative history of the statute and the recognized purpose of the retirement law is to protect "members by assuring the employee receives benefits for the entire period of eligibility . . . ." (*Weber v. Board of Retirement*, *supra*, 62 Cal.App.4th 1440, 1452.) Appellant points out, that under respondents' interpretation, two employees disabled on the same date will end up with different dates of retirement depending upon how much sick leave they have

---

[12] Appellant suggests that an employee who unsuccessfully attempts to return to work may not be found to have received "regular compensation" during that period. We are not persuaded by appellant's citation to *McMackin v. Great American Reserve Ins. Co.* (1971) 22 Cal.App.3d 428 [99 Cal.Rptr. 227], wherein the court recognized an interruption in the period of disability arising from injury did not preclude recovery for a recurrent disability, stating: "An insured should not be penalized for a desire to resume his job, and a futile effort to return to work, notwithstanding the existence of disability, will not preclude recovery of benefits once the claimant's condition has become stationary and permanent." (*Id.* at pp. 437–438.) The case did not arise in the pension system context, but was an action by an insured against his insurer on a sickness and accident disability policy. The issue was whether the insured's disability was total and permanent.

used and when. However, even under appellant's interpretation, the two could end up with different retirement dates, depending upon when each applied for a disability retirement and whether the injured employee attempted to return to work. In any event, we reject appellant's claim that the last day for which an employee received compensation for performing regular duties is somehow more certain than the last day the employee utilizes sick leave or vacation.

Finally, respondents argue that equity does not support a different result. Although appellant will not receive a retroactive retirement allowance, she has benefitted from the wording of the statute by being able to return to the county's payroll and to postpone the effective date of her retirement, thereby retaining her health insurance as a retiree. Appellant knew the consequences of electing to retain her health benefits over retroactive disability retirement. Recognizing this may have presented appellant with a Hobson's choice because the Board had determined her December 2002 compensation prohibited an earlier retirement date, respondents contend that appellant was placed at risk of not receiving health insurance as a retiree because of her late application for disability retirement, filed nearly one year after her county health insurance lapsed. Respondents point out were we to agree with appellant's interpretation and to reverse and remand to the trial court, the presumptive date of retirement under section 31724 is the date of application, unless appellant can prove that the date should be earlier because of administrative oversight or an inability to ascertain the permanency of her incapacity (§ 31724). On remand, there is no assurance that appellant would be able to meet her burden of proving the delay in filing her application was due to an inability to ascertain the permanency of her incapacity. If appellant cannot so prove, under her own interpretation of the statute, she would once again face losing her health insurance, as the effective retirement date would be the date she filed her disability retirement application, February 6, 2002, nearly one year after the lapse of her health insurance.

## CONCLUSION

In sum, we are persuaded that the term "regular compensation" in section 31724 includes compensation received for sick leave and vacation when taken by appellant as time off. Therefore, the trial court did not err in denying appellant's petition for a writ of mandate.

## DISPOSITION

The judgment is affirmed.

Lambden, J., and Richman, J., concurred.